**In re Gerald S. BUCHANAN, Debtor.**

**Bankruptcy No. 97–51293.**

United States Bankruptcy Court,
D. Minnesota.

Aug. 27, 1998.

Roylene A. Champeaux, Asst. U.S. Atty., Minneapolis, MN, Lawrence Casper, U.S. Dept. of Justice, Washington, DC, for I.R.S.

Rosanne H. Wirth, Minnesota Dept. of Revenue, Tax Litigation Division, St. Paul, MN, for Minnesota Dept. of Revenue.

Greg C. Gilbert, Johnson, Killen, Thibodeau & Seiler, Duluth, MN, for Debtor.

## ORDER OF DISMISSAL

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for trial on the motions of the United States and the Minnesota Department of Revenue for dismissal of the debtor's Chapter 13 case. Greg C. Gilbert appeared for the debtor. Lawrence A. Casper, United States Department of Justice Trial Attorney, and Roylene A. Champeaux, Assistant United States Attorney, appeared for the United States. Rosanne H. Wirth, Assistant Attorney General, appeared for the Minnesota Department of Revenue.

This court has jurisdiction over the motion pursuant to 28 U.S.C. §§ 157(b) and 1334, and Local Rule 1070-1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

## BACKGROUND

Since at least 1989, the debtor, Gerald Buchanan, has owned and operated, for various periods of time, several home health care and other businesses. Facing unsatisfied tax liabilities as far back as 1984 and including tax years 1989, 1990, 1991, 1992, 1994, 1995, and 1996, the debtor filed a case under Chapter 7 in June of 1996 (Case No. 96–50550).

The debtor received his discharge on October 2, 1996.

On October 22, 1997, the debtor filed this Chapter 13 case. The United States, acting through the Internal Revenue Service, and the Minnesota Department of Revenue, filed claims, to which the debtor objected. They also brought the present motions to dismiss the debtor's case on the basis of the debtor's lack of good faith.

The United States and the Minnesota Department of Revenue contend that the debtor has engaged in sham sales of several of his businesses and has otherwise misrepresented material information regarding his assets to the government in order to devalue and or avoid his tax liabilities. The debtor argues that the government's interpretation of the facts and deposition testimony is incomplete and or inaccurate and essentially amounts to a case of circumstantial speculation and not reliable or persuasive evidence of bad faith.[1]

## DISCUSSION

### The Good Faith Requirement

Section 1307(c) of the Bankruptcy Code provides that the Court may dismiss a Chapter 13 case for cause. Lack of good faith in filing constitutes cause for purposes of 11 U.S.C. § 1307(c). *See In re Belden,* 144 B.R. 1010, 1019 n. 17 (Bankr.D.Minn. 1992). Similarly, the Code imposes the requirement of good faith by providing that Chapter 13 plans shall be confirmed only if the plan has been proposed in good faith. See 11 U.S.C. § 1325(a)(3). The distinction between good faith in filing a case and good faith in proposing a plan is nominal and the evidence of each may be properly considered together. *In re Belden,* 144 B.R. at 1019.[2]

The elements of determining good faith in the Eighth Circuit have developed over three significant cases. First, in *United States v. Estus (In re Estus),* 695 F.2d 311, 316 (8th

---

1. The debtor also argues that some of the assets at issue in this case are the property of his Chapter 7 estate and the concern of the Chapter 7 trustee. However, even to the extent that is true, it fails to explain the debtor's present non-disclosure and scheduling of those assets with proper valuation and applicable exemption. Indeed, some of the disputed assets that the debtor contends are the property of the Chapter 7 bankruptcy estate were not disclosed in the Chapter 7 case.

2. It is possible that, under the right circumstances, a case could be filed in good faith, but the plan proposed in bad faith.

Cir.1982), the Court of Appeals specified a lengthy list of considerations. Several of the *Estus* factors address the reasonableness of the debtor's proposed plan in light of his assets and earning abilities and inquire into the debtor's attempt at fairness in a plan's proposed treatment of creditors.

The other *Estus* factors address the level of integrity demonstrated by the debtor in participating in the bankruptcy process, which integrity is at the heart of the government's claim of bad faith in this case. Such elements include "the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; the frequency with which the debtor has sought bankruptcy relief; [and] the motivation and sincerity of the debtor in seeking Chapter 13 relief." *In re Estus*, 695 F.2d at 317.

A few years the later, the Court of Appeals determined that amendments to the Bankruptcy Code subsequent to *Estus* separately addressed the criteria focusing on a debtor's ability to pay and narrowed the good faith analysis to just three factors: "whether the debtor has accurately stated debts and expenses; whether the debtor has mislead the court or made any fraudulent misrepresentations; and whether the Bankruptcy Code is being unfairly manipulated." *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir.1987).

Finally, in *Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1349 (8th Cir.1990) (en banc), the Court of Appeals clarified that although *Zellner* narrowed the good faith inquiry, it was nevertheless still based on a totality of the circumstances test. The Court emphasized that in addition to the three factors given paramount importance in *Zellner*, the good faith inquiry must also be sure to consider the type of debt sought to be discharged, whether the debt is nondischargeable under Chapter 7, and the debtor's motivation and sincerity in seeking Chapter 13 relief. *In re LeMaire*, 898 F.2d at 1350. The Court in *LeMaire* also expressly noted that the pre-filing conduct of the debtor is relevant to the good faith issue. *Id.* at 1352.

See also, *Bayer v. Hill (In re Bayer)*, 210 B.R. 794, 795–96 (8th Cir. BAP 1997).

Accordingly, the formal test for good faith, by the terms of its most recent expression in *LeMaire*, and the test I will apply in this case, is a totality of the circumstances test with six factors earmarked for particular attention: (1) the debtor's accuracy in stating his debts and expenses; (2) the debtor's honesty in the bankruptcy process, including whether he has attempted to mislead the court and whether he has made any fraudulent misrepresentations in the matter of his bankruptcy; (3) whether the Code is being unfairly manipulated; (4) the type of debt sought to be discharged; (5) whether the debt would be nondischargeable under Chapter 7; and (6) the debtor's motivation and sincerity in seeking Chapter 13 relief.

*False Statements in the Debtor's Petition, Schedules, and Statement of Affairs*

1. Right from the beginning, on the first page of his petition the debtor failed to disclose trade names he used in the prior six years. Under the required heading "ALL OTHER NAMES used by the debtor in the last 6 years (Include [ ] trade names)", the debtor listed "none" when, in fact, he operated at least six sole proprietorships during that period of time, including Health Personnel, Silver Lining Assisted Lifestyles, Monroe Electronics, United Publishing, Monroe Underwater, and Covenant PCA Services.

2. In his Schedule I, the debtor merely lists his occupation as "contract, business operation," which ambiguously suggests that the debtor's income is derived from working under a contract and separately from operating a business, or solely from operating a business pursuant to a contract. In fact, the debtor's single occupation was operating his own one business, under various names including Health Personnel and Covenant PCA Services.

3. In his Statement of Financial Affairs, the debtor indicated that his only involvement with any businesses since 1995 was with Covenant PCA Services

and Monroe Electronics. However, under the heading "income other than from employment or operation of business," the debtor admitted that in 1996 and 1997 he also earned substantial income from a source identified by the debtor as "Health Personnel Contract."[3] Nevertheless, on his Schedule B, the debtor entered a value of zero for the "Contract for the Purchase of Health Personnel."

Purportedly then, by "contract" the debtor meant to convey that he earned income from the proceeds of the sale of the business known as Health Personnel, and by "business operation" he meant that he earned income from the revenue generated by running his businesses Covenant PCA Services and Monroe Electronics. However, as I will explain in more detail, the debtor's revenue was all derived from operating the same home health services business, under different names, and his characterization was deliberately misleading and unclear.

4. Although the debtor does not contest that he owes substantial tax liabilities, and although the IRS has properly filed liens, the debtor did not list the IRS as a secured creditor in his Schedule D.

5. In his Schedule B, the debtor did not disclose his sole proprietorship interest in any of his current or dissolved businesses, even those producing significant revenue, including Health Personnel and Covenant PCA Services.[4] Indeed, the debtor did not disclose his interest in Covenant PCA Services or its value in this petition or in his Chapter 7 petition even though Covenant PCA Services was formed in 1993, three years before the Chapter 7 case and four years before the instant case.

6. In Schedule B the debtor indicated the value of his interest in the Buchanan Family Limited Partnership at zero. In his Schedule C, he claimed his interest in the partnership as an exemption with a value of approximately $60,000. However, for at least five years the debtor's parents have annually given a $20,000 interest in the partnership to each of their children, including the debtor. Although the debtor has no right to a disbursement of funds from his vested portion of the partnership res while either of his parents are alive, his interest in the partnership had value and the fact that the asset may not be liquid does not deprive it of value nor does it explain the inconsistencies in the debtor's disclosures about his interest in the partnership.

7. The debtor also failed in his petition to disclose or schedule his interest in a boat, the value of which is at least $11,000 as evidenced by the price most recently paid for it. The debtor's failure to schedule the boat is best explained by the fact that he attempted to hide his ownership of it. The boat was seized by the IRS and sold at auction. Karl Norman, a friend of the debtor's and the debtor's family, received from the debtor himself between $11,000 and $12,000 on the morning of the sale so that Norman could buy it back for the debtor. Upon buying the boat at the IRS auction, Norman immediately returned it to the custody of the Buchanan family, does not know its whereabouts, has not and does not use or maintain the boat, and only discovered that it was titled in his name during the present litigation. The debtor, however, has possession of and uses the boat, despite his assertion that he does not own the boat.

8. Finally, in both his Schedule I and his Statement of Financial Affairs, the debtor inaccurately reported his in-

3. This would apparently correspond to the debtor's indication of "contract" as part of his occupation.

4. The debtor merely included Covenant PCA Services and Monroe Electronics as sources of in-

come but did not indicate his ownership interest in those or his other companies. He indicated his interest in Health Personnel as zero and defined his interest as deriving from a contract for the sale of Health Personnel.

come. In his Schedule I, the debtor indicated an annual income of approximately $70,000, and he failed to attach a detailed financial statement for the business as required. In his Statement of Financial Affairs, the debtor reported his 1997 income to be more than $240,000, including income derived from both Covenant PCA Services and Health Personnel. The Minnesota Department of Human Services, however, paid Covenant PCA Services more than $250,000 in 1997, and separately made similarly large payments to the debtor's business under other names, including to Health Personnel and Silver Lining Assisted Lifestyles. The debtor's reported numbers are similarly undervalued for 1996.[5] Notwithstanding the revenues the debtor produced through these variously named versions of the same business, he also reported his interest in them as sale contracts valued at zero in his Chapter 7 proceeding.

The debtor has not attempted to reconcile the inaccuracies apparent with respect to Covenant PCA Services, and indeed I see no way that he could do so. His argument as far as his failure to disclose and accurately represent his interest in Health Personnel and Silver Lining Assisted Lifestyles and their respective generous revenues is that he sold those companies in 1992 to his daughter, Amy, prior to either of his bankruptcy cases, and that the gross revenues generated therefrom do not correspond in any way to his income. That contention, however, is a fraud upon the court for the reasons set forth below.

### Pre–Petition Conduct

Over the course of a week in 1992, the debtor and his daughter, Amy Jo Buchanan, entered into agreements purporting to sell to Amy four businesses owned and operated by the debtor, including Health Personnel, Silver Lining Assisted Lifestyle, Monroe Electronics and United Publishing. Silver Lining

and Health Personnel were productive home health care companies at the time, and the other two companies, a marine technology business and a mail-order brochure enterprise, had at a minimum been active at some time but may already have been dormant at the time of the purported sales.

The terms of the contracts suggest the spurious nature of the transactions. The purchase price for Health Personnel was $150,000, payable in monthly installments equal to 90% of the net profits for the applicable month. The purchase price for Silver Lining Assisted Lifestyles was $400,000, payable in monthly installments equal to 90% of the net profits. Similarly, the purchase price for Monroe Electronics was $500,000, payable at 80% of the net profits. Nevertheless, the debtor valued these businesses in his bankruptcy cases, to the extent he disclosed them at all, at zero.

The contracts generously provide that if expenses exceed income in a given month, then no payment is necessary. However, if no payments are made for four consecutive months, then the ownership of the business reverts to the seller. While on the surface these provisions appear to give the buyer a three month grace period for tough times, in reality the result in this case was to vest the debtor-seller with the power to control who would own the companies and when, or to nominally transfer ownership in order to avoid an inconvenience of ownership, such as tax liability.

That purpose of the contracts is clear from the performance of the parties to the contracts. It was the debtor who continued to run the businesses even after their purported sales to his daughter. He controlled the productivity, if any, of the businesses, and he thereby determined if and when payments would be made, and if and when which businesses would revert to him.

The debtor contends that, except for Health Personnel, all of the businesses sold to his daughter, Amy, reverted to him after

---

5. The debtor's income post-petition is also necessarily greater than he would have the Court, the Chapter 7 trustee and his creditors believe, as demonstrated by the fact that the Minnesota Department of Human Services had paid over $275,000 to Covenant PCA Services in only the first half of 1998.

four months because no payments were made. However, the evidence is patent that even after the purported sale of Health Personnel to Amy Buchanan it was the debtor who continued total control of the business. Amy was merely the nominal owner. The debtor continued at all times to run the business. He hired and supervised employees and signed the checks. One employee, Julie Remington, saw Amy Buchanan not more than three times since 1996 and has never had any business related contact with her. Indeed, 'Ms. Remington testified that she started as an employee of Health Personnel and became an employee of Covenant PCA Services when the "name changed."

Moreover, Amy Buchanan has a sporadic, mostly non-business employment history. She devoted most of her time to pursuing a music career. She has no higher education in business or otherwise, her attendance at trade shows with her father was as part of their father-daughter relationship and not for any business purpose, and her residence has been and continues to be in Minneapolis.

Amy is ignorant as to the details of managing any business: she does not know what or where the company's business records are maintained, who exactly maintains them or has access to them, and she can not accurately define the difference between such basic concepts as gross and net income. Amy Buchanan owns Health Personnel in name only. She did not and does not have any actual ownership of the company.

In addition to not making any payments under the purported contracts for the sale of the debtor's three businesses and not personally procuring and disbursing the payments under the Health Personnel contract from that entity's profits, Amy also did not perform her other buyer responsibilities enumerated in the purported contracts. Each of the contracts provided that an accounting be completed by the 7th day of each month and provided to the seller with the monthly payment computation, whether or not a payment was to be made. There is no evidence that this was ever done and neither the debtor nor Amy claims that it was ever properly accomplished.

The debtor's behavior is also consistent with finding that Amy Buchanan was a false owner of Health Personnel and the other companies to which she held title, and that the purported sales were shams intended to divert or undervalue assets. The debtor continued, after transferring Health Personnel to his daughter, to hire and supervise employees of the business. He did so without a salary because he "had an interest in the business." Indeed, the debtor owned Health Personnel and personally collected substantial sums of its revenue even after the purported sale of the business to Amy. In fact, there is no evidence that Amy ever personally derived income from Health Personnel.

It was the debtor who opened a bank account for Health Personnel. It was the debtor who had signature authority on the Health Personnel account since 1994. The debtor used that account to pay his personal bills. The debtor made his daughter's Chapter 13 plan payments out of the Health Personnel checking account.

According to the terms of the purported sales contract, the debtor-seller was required to maintain a declining balance accounting record and to provide such to the buyer on a monthly basis. There is no evidence of any record and neither the debtor nor Amy claims that it was ever created or provided.

The debtor testified that Silver Lining Assisted Lifestyles and Health Personnel, except for keeping separate federal employment tax postures, had otherwise merged into one company by 1990. Yet this is inconsistent both with the separate contracts purporting to sell each of those businesses, and with the debtor's claim that Silver Lining but not Health Personnel reverted to him. In addition, the debtor's admission that Silver Lining reverted to him in sometime in 1992 raises unrelated but serious implications because Amy Buchanan filed her own Chapter 13 bankruptcy case "d/b/a Silver Lining Assisted Lifestyles" in 1995.

It is clear that the transfers to his daughter were sham transactions designed only to fool the tax collectors and prevent them from collecting his tax debts. In fact, the debtor, while not admitting to the sham nature of the purported sales transactions, admitted that the "primary motivating factor" for the sales

to his daughter was the IRS liens and the IRS levies on the income of Health Personnel.

Whether or not the purported sales of the debtor's variously titled business interests to Amy Buchanan legally constitute fraudulent conveyances, what is paramount for bankruptcy purposes is that in filing his Chapter 13 case and proposing his Chapter 13 plan, the debtor deliberately misrepresented and undervalued his interests in these entities.

This case is, as the Court of Appeals for the Eighth Circuit once described a similar case, "a case where the tangle of facts makes the legal issues appear more difficult than they are." *Palatine National Bank v. Olson (In re Olson )*, 916 F.2d 481, 483 (8th Cir. 1990). Like *Olson,* in this case the debtor's claim that he lacks interest in Health Personnel is perhaps supported by form but not substance.[6] *Id.* The other inconsistencies within his petition and between his petition and deposition and other evidence do not survive analysis under form or substance.

In *Olson* the Court of Appeals held that "[t]o bar a discharge, the debtor's misrepresentation must be material." *Id.* at 484. The Court went on to explain that, while value is relevant to materiality, it is not determinative:

> The subject matter of a false oath is "material," and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

*Id.,* citing *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984) (per curiam). Although *Olson* involved a Chapter 7 debtor and the finding of a material false oath resulted in denial of discharge, it is an easy transition to find that the same conduct in a Chapter 13 case constitutes bad faith.

### LeMaire Analysis

Under the totality of the circumstances test for good faith in filing a Chapter 13 case

and proposing a Chapter 13 plan, as set forth in *LeMaire,* the debtor's case must be dismissed. The lack of the debtor's accuracy in stating his debts is manifest by his attempts to dodge tax liabilities by denying ownership in entities with substantial outstanding tax obligations.

The record is replete with serious instances of the debtor's lack of honesty in the bankruptcy process, so much as to warrant characterization as a pervasive and extensive fraud upon his creditors.

That the Code is being unfairly manipulated by the debtor's conduct is probably best, though not solely, demonstrated by his transfers of multiple assets to his daughter and his subsequent serial bankruptcy cases, including that filed by his daughter.

The type of debt sought to be discharged includes various secured and unsecured priority and nonpriority claims of federal and state taxes owed, those the debtor was not able to discharge in his earlier Chapter 7 case.

Finally, upon considering all the evidence and filings submitted, I conclude that as to the debtor's motivation and sincerity in seeking Chapter 13 relief, he was motivated by his desire to retain as much valuable property as he could reasonably hide, divert or undervalue, rather than participating in the Chapter 13 process with a mind to repay creditors as much value as reasonable and possible.

IT IS ORDERED:

1. This case is dismissed.
2. The debtor is barred from filing another bankruptcy petition under any chapter of the Bankruptcy Code for 180 days from the date of this Order.

---

**6.** In *Olson* the Court of Appeals affirmed the Bankruptcy Court's finding that "the following facts belied Olson's claims [of disinterest]: his involvement in almost every aspect of the [business'] operation, the funneling of Olson's money into the [ ] enterprise through [his other] various entities [ ], and [the nominal owner's] lack of experience with this kind of venture." *Olson,* 916 F.2d at 483. Moreover, the Court of Appeals affirmed the Bankruptcy Court's holding that "Olson's claims of disinterest amounted to false representations of his finances under oath." *Id .*