**In re Reynold MATTSON and Patricia Mattson, Debtors.**

**Bankruptcy No. 99–42865.**

United States Bankruptcy Court, D. Minnesota.

Nov. 30, 1999.

---

Thomas F. Miller, Minneapolis, MN, for debtor.

Thomas Johnson, Chapter 13 Trustee, Minneapolis, MN, for trustee.

Melissa Hortman, Gregory Luce, Luce & Hortman, PLLP, Minneapolis, MN, John G. Berg, Minneapolis, MN, for creditors.

## ORDER DENYING CONFIRMATION AND DISMISSING CASE

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on August 26, 1999, with post-trial briefing thereafter, on an objection to confirmation of Debtors' Third Modified Chapter 13 plan and motion to dismiss or convert brought by creditors Stormy Harmon, Andrea Harmon, Sandra Harmon, and Farha Beswick ("Objecting Creditors"). Tom Johnson appeared on behalf of the Trustee; Thomas Miller appeared on behalf of the Debtors; and Melissa Hortman and Gregory Luce appeared on behalf of the Objecting Creditors. Having heard and considered the evidence, the arguments, and the briefs,

along with the affidavits filed in support thereof, I make the following: [1]

## FINDINGS OF FACT

1. The Objecting Creditors are African Americans, a mother and her three young children. They are a low income family, surviving through government assistance. The mother, Stormy, is disabled, suffering from mental and emotional problems. The Objecting Creditors formerly lived in a rental unit owned by the Debtors.

2. The Debtors are a couple, aged 59 and 62. Their main occupation is as landlords for rental properties in the Twin Cities area.

3. According to their amended Schedule J, the Debtors' personal and household expenses total approximately $2,600 per month.

4. The Debtors' primary source of income is derived from six rental properties comprising a total of ten units. They cater mostly to low income tenants such as the Objecting Creditors. The Debtors perform all of the management functions themselves, including maintaining the properties and choosing the tenants. Debtors gross approximately $7,000 per month from the rental properties. Based upon quarterly income and expense reports submitted by the Debtors for the First and Second Quarters of 1999, their expenses related to the rental properties total almost $2,000 per month. The Debtors attempt to increase their total expenses by including legal and professional fees related to litigation with the Objecting Creditors. As this expense should decline or disappear in the next few months, I will not include it in the calculation of the Debtors' business expenses. The Debtors further claim that more than $15,000 in repairs, which were deferred because of the expense of litigation, will be substituted for the declining legal fees for at least one or two quarters. These repairs include replacing the roof on one unit and fixing the front steps of another. I find these repairs unnecessary, a mere attempt to artificially decrease net income from the properties.

5. Each of the Debtors also engages in part time work. Mr. Mattson sells used automobiles, which caused him to sustain a minimal loss in the First Quarter of 1999. Mrs. Mattson sells Shaklee Products and earned more than $1800 per month in that endeavor during the First Quarter of 1999. The Debtors did not provide the court with information regarding their income from these enterprises for the Second Quarter of 1999. The Debtors also derive a small income from their interest in three parcels of unimproved land.

6. The Objecting Creditors commenced litigation against the Debtors on or about December 18, 1996. The complaint alleged, *inter alia,* discrimination in housing on the basis of race, gender, disability, and receipt of public assistance; violations of landlord-tenant laws; breach of contract; and intentional infliction of emotional distress. The complaint was based on allegations that Debtors, in particular Mr. Mattson, engaged in a racially inflammatory, prurient, and threatening course of conduct towards the Objecting Creditors. Specifically, Debtors were alleged to have attempted for over one year to make life miserable for the Objecting Creditors in an effort to force them out of the rental property after Stormy Harmon constantly complained about furnace deficiencies, which she viewed as dangerous to herself and her family, and refused to accede to Debtors' request that she file an application to obtain a new furnace for Debtors for free. Specifically, the claim was that Mr. Mattson engaged in activities purposely designed to terrify and threaten Ms. Harmon and her children with the purpose in mind of forcing them to leave the leased

---

1. In addition to the testimony and exhibits offered at the hearing on August 26, 1999, the parties stipulated that the record would include papers filed in connection with the earlier scheduled motion to dismiss or convert filed on July 26, 1999.

premises. Included were the following: repeatedly calling them "niggers" and "black bitches;" entering the apartment unannounced, at unreasonable times, and in a threatening manner; breaking down the door of the apartment while Stormy and her child cowered in the basement and while Mr. Mattson was under a court-imposed restraining order not to get near her; leering at Ms. Harmon in the privacy of her bedroom as she dressed; peeking in windows; and otherwise taking totally unreasonable and assaultive actions. Stormy Harmon claimed that these actions caused her pain and fear of potential physical abuse. One of the most inflammatory allegations was that Mr. Mattson chased the children with a stick while calling them "niggers." Mrs. Mattson was alleged to have known of, acceded to and benefitted from these actions.

7. The case was tried to a jury on July 23, 24, 25, and 29, and August 1, 4, and 5, 1997. The jury returned a unanimous verdict against both Debtors and for the Objecting Creditors on August 7, 1997, in the amount of $523,191. The jury specifically found for the Objecting Creditors on their claims that both Mr. and Mrs. Mattson had discriminated in housing on the basis of race, disability, gender, and receipt of public assistance; breach of contract; trespass; breach of the covenant of habitability; and intentional infliction of emotional distress. The jury returned, on clear and convincing evidence, a punitive damages award of $82,000 based upon a finding of a "deliberate disregard for the rights or safety of others," by both Mr. and Mrs. Mattson.

8. Following the verdict Debtors have spent more than two years doing everything they could to prevent the Objecting Creditors from collecting on the judgment while their appeal to the Minnesota Court of Appeals was pending.

9. Within days after the verdict, the Debtors formed a corporation called RMP Properties, Inc. and transferred to it each of their rental properties for little or no consideration. They also transferred a property to their daughter through a quit claim deed.

10. In the past two years the Debtors have entered into a series of transactions through which they borrowed a significant sum of money to fund a "scorched earth" battle against collection on the judgment:

a. Again within days of the verdict, on August 18, 1997, Debtors borrowed $72,000 from Marlyn and Marlys Wolbert, Mr. Mattson's sister and brother-in-law. A promissory note to the Wolberts in this amount was secured by a mortgage covering one of the Debtors' real properties. Debtors used this money to pay off a mortgage on one of their properties and to pay legal fees.

b. At the same time, Debtors borrowed an additional $35,000 from the Wolberts, which was similarly secured by a mortgage on certain of their properties. Again they used this money to pay legal fees.

c. Nine months later, Debtors signed a promissory note and mortgage in the amount of $50,000 in favor of the Wolberts and mortgaged more of their real properties. While the mortgage reflected a debt of $50,000, Debtors now acknowledge that they actually received only $25,000 of this sum. This third promissory note and mortgage was later assigned to Clifford Olson, a long-time family friend.

d. At around the same time, Debtors signed another $50,000 promissory note and mortgage on their real properties in favor of the Wolberts. The Debtors now admit that they did not receive any value in exchange for this note and mortgage.

e. Finally, in March 1999, approximately two months before they filed for bankruptcy protection, Debtors borrowed yet another $30,000 from Clifford Olson and signed a Promissory Note and mortgage on their real properties.

The sum and substance of these activities was that Debtors now have $162,000 in additional debt, most, if not all, of which

has been used to prevent the Objecting Creditors from recovering on their judgment. In addition, as a result of the two "phantom mortgages," Debtors looked to be even further in debt and mortgaged in the amount of $75,000. When the "phantom mortgages" came to light in connection with the bankruptcy case, and while this motion to dismiss was pending, on August 23, 1999, Debtors filed satisfactions on the "phantom mortgages."

11. The Debtors allege that as a result of the foregoing indebtedness, they make monthly payments to Olson and the Wolberts that were not included on their schedules. In support of this contention, the Debtors submitted to the court canceled checks made payable to the Wolberts and Olson. However, several of these checks appear to be altered and back dated. In addition, some of the checks, representing payments over several months, are numbered sequentially. Accordingly, the Debtors do not appear to have made regular monthly payments to these creditors as they now claim.

12. Not only have Debtors borrowed heavily to fund their defense, they have repeatedly taken steps in state court to drag out the appeal process, apparently hoping to "milk" the properties of income for as long as possible. They do not have sufficient assets to obtain a supersedeas bond. Following entry of the state court judgment, Debtors timely moved for a new trial or for judgment notwithstanding the verdict. On August 17, 1998, after numerous delays caused, in part, by the Debtors, the trial court granted the Debtors' motion, in part, and reduced the amount of the verdict to $331,691.00. The court also granted the Objecting Creditors' motion for prejudgment attachment and the appointment of a receiver. In an effort to reduce the punitive damages award, Debtors submitted two affidavits to the court relating to their net worth. The second, which amends the first, states that the Debtors' have a net worth of $277,545.00, including all of their real property.

13. On September 4, 1998, the date that the receiver was to assume control of the Debtors' rental properties, the Debtors filed their first Chapter 13 bankruptcy petition. The petition was incomplete, and on September 22, 1998, the case was dismissed for failure to file schedules. Just prior to this first bankruptcy filing, Debtors had transferred title to their rental properties back to themselves from RMP Properties, Inc.

14. Debtors quickly filed another Chapter 13 bankruptcy petition on October 5, 1998. At that time, the state court had not yet entered money judgment against the Debtors, so the Objecting Creditors' claim remained unsecured. Because, until judgment was entered, Debtors would not meet monetary eligibility standards for Chapter 13, Debtors sought entry of the judgment during the pendency of the bankruptcy despite the existence of the automatic stay. However, the bankruptcy court ruled that the Debtors did not qualify for Chapter 13 relief because the judgment was not entered as of the date of the bankruptcy filing. Accordingly, the verdict against the Debtors was unsecured and exceeded the allowable amount of unsecured debt for a Chapter 13 case. The court dismissed the second bankruptcy on January 7, 1999.

15. During the second bankruptcy, again despite the automatic stay, the Debtors filed a notice of appeal in the state court litigation. Although the timing of the appeal created confusion as to the jurisdiction of the Court of Appeals, that confusion was ultimately resolved.

16. Following the dismissal of the second bankruptcy, the Objecting Creditors attempted to undertake collecting the judgment. However, they encountered numerous delays because the entry of the judgment during the pendency of the second bankruptcy was invalid. After the imposition of a temporary restraining order and at least two hearings before the state court, judgment was again entered

on May 4, 1999, in the amount of $331,-691.00.

17. The Objecting Creditors resumed their collection activities. The Debtors responded by filing the present bankruptcy case, this their third Chapter 13 petition, on May 26, 1999. Immediately thereafter they filed a motion to amend the stay to allow them to proceed with their state court appeal, which was granted.

18. This is essentially a two-party dispute between the Objecting Creditors and Debtors. Debtors have minimal (given their assets and income) unsecured debt owed to a few other creditors. The claim of the Objecting Creditors represents approximately 90% of the unsecured claims. The Debtors admitted that, in part, they filed this bankruptcy petition because they could not obtain a supersedeas bond to stop the Objecting Creditors' collection activities during the appeal.

19. Debtors' First Chapter 13 Plan in this case proposed to pay $1,500 per month for 60 months, to pay the minimal tax priority claims immediately, and to pay the Olson and Wolbert claims according to their terms outside the Plan. The Plan proposed to treat the Objecting Creditors' Claim as partially secured, to the extent it was upheld on appeal, in amounts determined on appeal. There were no provisions for sale of any of the Debtors' properties to fund the Plan and no payments were to be made within the Plan to any creditors until the state court appeals process was concluded.

20. The Objecting Creditors immediately objected to the Plan and moved for dismissal, in part arguing that Debtors had not filed for bankruptcy relief in good faith, that there were many inaccuracies in Debtors' filed papers and that the Plan did not meet the best interests of creditors test. In response, Debtors amended their Schedules and Statement of Financial Affairs, making minor adjustments in the same, and providing further detail with respect to income from their various businesses. They also modified their Plan to provide enhanced treatment to the Objecting Creditors' claim. The claim would be treated as fully secured, and Debtors agreed to sell their real properties pursuant to a schedule and order to be determined solely by them.

21. Debtors filed a Second Modified Plan and at the hearing announced that they would be filing a Third Modified Plan. These two plans are basically similar, with minor details changed to respond to the Chapter 13 Trustee's arguments regarding clarity in wording and administrative difficulties.

22. In their Third Amended Plan, which is before me for confirmation, the Debtors propose to pay to the Trustee $1500 per month for 60 months and to begin a controlled sale of their rental properties. Priority tax claims, which are minimal in amount, will be paid immediately. Debtors will continue making monthly payments outside the plan to Olson and the Wolberts. Each of these activities are to take place over a five year time frame. Sales efforts for the first property to be sold need not begin until one year after commencement of the case; subsequent properties must be put up for sale at six month intervals thereafter. The Debtors maintain that the combination of their monthly payments and the liquidation of their rental properties will allow the Objecting Creditors to be paid in full at the end of the five years. During such time, however, Debtors would remain in control and possession of the properties with sole discretion as to how to operate them and how to, at what price, and basically when to liquidate them.

23. The Debtors assert that their plan is best for the creditors because their rental properties would be very difficult to sell at this time due to the high maintenance costs, including the deferred maintenance. To the contrary, the Objecting Creditors' expert testified, and I find, that in light of the current real estate market, now is the best time to sell. I also find that there is

no need for the extensive repairs Debtors assert are necessary and that the properties would sell for a high price in the current real estate market regardless of the need for repairs.

24. The Objecting Creditors assert that the flaw in the Plan is that it leaves Debtors in control of their property and allows Debtors to pay their secured creditors outside the plan according to the terms of the various notes they entered into, while forcing the Objecting Creditors to initially receive only a pro-rata portion of their proposed payment of $1,500 for 60 months until such time as Debtors choose to sell the properties. They assert that liquidation now is the only fair alternative and that Debtors would have little incentive to maintain the properties over time (because they will lose them). Debtors, on the other hand, assert that they have an incentive to maintain the value of the properties during the five year plan because, if they do so, they may be able to retain some of their assets following the bankruptcy, which are necessary for their retirement.

25. The Objecting Creditors assert that the Debtors' plan should not be confirmed for a number of reasons, including lack of good faith and failure to meet the best interests of creditors test, and their bankruptcy case should be dismissed due to the Debtors' lack of good faith.[2]

26. On November 23, 1999, the Minnesota Court of Appeals issued its decision affirming the trial court in part and reversing in part. The Court of Appeals left undisturbed the factual findings of the trial court and held that such facts supported a finding of racial discrimination in housing. The Court went on to hold that the facts did not support a finding of housing discrimination based on gender, disability, or receipt of public assistance or a finding of intentional infliction of emotional distress.

Accordingly, the Court reduced the damages award to $79,681. It further eliminated the punitive damages award based on the failure of the Objecting Creditors to follow the proper procedure.

## CONCLUSIONS OF LAW

■ There are two instances in a Chapter 13 case when good faith becomes an issue. First, Bankruptcy Code § 1307(c) provides that the court may dismiss a case or convert it for cause. 11 U.S.C. § 1307(c) (1994). Numerous courts have held that filing a Chapter 13 petition in bad faith is cause for conversion or dismissal under § 1307(c). *E.g., Molitor v. Eidson (In re Molitor)*, 76 F.3d 218, 220 (8th Cir.1996); *In re Buchanan*, 225 B.R. 672, 673 (Bankr.D.Minn.1998). Second, Bankruptcy Code § 1325(a)(3) provides that, in order to be confirmed, a Chapter 13 plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1325(a)(3).

■ The Objecting Creditors in this case assert that the Debtors have acted in bad faith in both respects. However, the difference between good faith in filing a case and good faith in proposing a plan is nominal, and the evidence of each may be properly considered together. *Buchanan*, 225 B.R. at 673; *In re Belden*, 144 B.R. 1010, 1019 (Bankr.D.Minn.1992). Indeed, the Eighth Circuit has articulated the same standard for finding bad faith in both instances. *Compare Molitor*, 76 F.3d at 220–21 *with Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1349 (8th Cir. 1990). The only distinction between the two may be in the burden of proof. Under § 1307(c), the objecting creditor bears the burden of proof, while under § 1325(a)(3), the debtor bears the burden. *In re Love*, 957 F.2d 1350, 1355 (7th Cir.1992).

2. The Objecting Creditors also initially asserted that the Debtors had filed false and misleading schedules and might have been ineligible for Chapter 13 relief. Neither of these arguments was pursued during the hearing,

and it is clear the Objecting Creditors are resting their case on reprehensible pre-filing conduct of the Debtors coupled with the "scorched earth" activities engaged in by the Debtors once the judgment was entered.

In the Eighth Circuit and in this District, the standard for determining bad faith has undergone substantial adjustment. The first case, *United States v. Estus (In re Estus )*, 695 F.2d 311 (8th Cir.1982), held that, after weighing all of the facts and circumstances, the proper inquiry is whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. *Id.* at 316. The court outlined several non-exclusive factors to consider when making the determination. Many of these factors addressed the debtor's ability to pay and whether the plan proposed a fair economic treatment of creditors. *Id.* at 317; *see Buchanan,* 225 B.R. at 674. The remaining factors considered the debtor's integrity in the bankruptcy process. *Estus,* 695 F.2d at 317; *see Buchanan,* 225 B.R. at 674.

Following amendment to the Code in 1984, the requirements for confirming a Chapter 13 plan changed, subsuming many of the economic factors outlined in *Estus. Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987). This change in the Code narrowed the focus of the good faith analysis. *Id.* According to the *Zellner* court, the remaining factors for the court to consider were (1) whether the debtor has stated his debts and expenses accurately; (2) whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; and (3) whether he has unfairly manipulated the Bankruptcy Code. *Id.*

Following *Zellner,* the Eighth Circuit decided *LeMaire,* which clarified the changes to the good faith test. *LeMaire* found that the totality of the circumstances test first announced in *Estus* remained the proper standard for the good faith inquiry. *LeMaire,* 898 F.2d at 1349. The court specifically focused on the type of debt sought to be discharged, whether the debt is non-dischargeable in Chapter 7, and the debtor's motivation and sincerity in seeking Chapter 13 relief. *Id.* When looking to the dischargeability of the debt, the court recognized that a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims. *Id.* at 1352. However, the court further noted that while pre-filing conduct is not determinative of the good faith issue, it is nevertheless relevant. *Id.*

The final Eighth Circuit case on this subject was *Noreen v. Slattengren,* 974 F.2d 75 (8th Cir.1992). In that case, the court found an abuse of the provisions, purpose, and spirit of the Bankruptcy Code where a major portion of the claims arose out of pre-petition wrongful conduct and the debtor proposed only a minimal repayment. The Debtor had filed the bankruptcy petition only 11 days before trial in a civil suit in anticipation of a damage award and proposed a meager repayment plan, which was increased only in response to an objection. *Id.*

 There are a number of cases in this District interpreting the Eighth Circuit's decisions on this subject. These cases suggest the importance of determining the debtor's purpose in filing the bankruptcy and proposing the plan. *E.g., In re Vance,* 49 B.R. 973, 976 (Bankr.D.Minn. 1985) (debtor's intent was to discharge interest and penalties incurred as a result of breaching scholarship program; "plan cannot be used to thwart the will of Congress"); *In re Breon,* 94 B.R. 576, 577 (Bankr.D.Minn.1988) (lack of good faith where debtor's sole purpose was to avoid paying debt to ex-spouse); *In re Belden,* 144 B.R. 1010, 1021 (Bankr.D.Minn.1992) (debtor's impermissible motivation in filing her ninth bankruptcy was to avoid NSP's attempt to disconnect her utility services); *In re Cordes,* 147 B.R. 498, 503 (Bankr. D.Minn.1992) ("Under *Zellner* and *LeMaire* the good faith requirement focuses on the debtor's motivation for seeking Chapter 13 relief; the financial and personal goals he seeks to accomplish through his case; and his attitude toward the integrity of the bankruptcy process, as mani-

fested on the face of his statements, schedules, pleadings, and plan:"). Two cases in this District, after synthesizing the Eighth Circuit cases, have summarized the factors to consider in the good faith analysis: (1) the debtor's accuracy in stating his debts and expenses; (2) the debtor's honesty in the bankruptcy process, including whether he has attempted to mislead the court and whether he has made any fraudulent misrepresentations in the matter of his bankruptcy; (3) whether the Code is being unfairly manipulated; (4) the type of debt sought to be discharged; (5) whether the debt would be nondischargeable under Chapter 7; and (6) the debtor's motivation and sincerity in seeking Chapter 13 relief. *In re Buchanan,* 225 B.R. 672, 674 (Bankr. D.Minn.1998); *In re Sitarz,* 150 B.R. 710, 721 (Bankr.D.Minn.1993). The bottom line for most courts, even those outside of this Circuit, is whether the debtor is attempting to thwart his creditors or is making an honest attempt to repay them. *See also In re Schaitz,* 913 F.2d 452, 453–54 (7th Cir.1990); *Hardin v. Caldwell (In re Caldwell),* 895 F.2d 1123, 1126 (6th Cir.1990); *Gier v. Farmers State Bank (In re Gier),* 986 F.2d 1326, 1330 (10th Cir.1993) (debtor motivated by desire not to pay creditors rather than inability to pay).

██ The Debtors' activities both pre- and post-petition have exhibited signs of bad faith. The totality of the circumstances compels me to conclude that the Debtors acted in bad faith both in filing their petition and in proposing their plan. I come to this decision based on the Debtors' prepetition conduct, which the Minnesota Court of Appeals found to be racially discriminatory,[3] coupled with the Debtors' conduct following such judgment, designed at every step of the way to thwart collection efforts. Moreover, aside from dealing with this judgment, Debtors are not in need of reorganization relief.

First, the Debtors engaged in reprehensible conduct that amounted to racial discrimination. The judgment arising out of such conduct is, at least arguably, nondischargeable in Chapter 7. Accordingly, the type of debt sought to be discharged indicates bad faith. *LeMaire,* 898 F.2d at 1352 ("While pre-filing conduct is not determinative of the good faith issue, it is nevertheless relevant."). However, the *LeMaire* court also notes that even the most egregious pre-filing conduct is insufficient on its own to support a finding of bad faith. *Id.* I will, thus, turn to the other actions of the Debtors that exhibit bad faith.

The Debtors' conduct following the verdict against them is also important to my finding of bad faith. *See Caldwell,* 895 F.2d at 1127 ("Although we consider as a factor what Caldwell did to incur the judgment, it is what he has done since the judgment to avoid paying it that is most important."). Every step of the way the Debtors have consistently attempted to avoid paying the judgment against them. Immediately after the verdict, they transferred a substantial portion of their assets to a newly formed corporation for little or no consideration and quit claimed property to a relative. Such conduct can only be described as a thinly veiled attempt to protect their assets from the Objecting Creditors. The Debtors then began to file numerous mortgages against their real property in favor of their relatives and a friend. For a substantial portion of these mortgages, the Debtors received no value in return.

---

3. In this respect, the present case is distinguishable from the case of *Bayer v. Hill (In re Bayer),* 210 B.R. 794 (8th Cir. BAP 1997). In that case the debtor filed a bankruptcy petition after a complaint was filed against him in state court but before he filed an answer. The B.A.P. determined that, in the absence of an adjudication of culpability, the bankruptcy court must hold an evidentiary hearing to determine the truthfulness of the allegations regarding the debtor's prepetition conduct. *Id.* at 796. Here, the state court has adjudicated the claims and found the Debtors culpable. Accordingly, I am relieved of the duty to make such a determination.

The Debtors have also engaged in a uniform pattern of delay. After the jury rendered its verdict, the Debtors' activities, in part, helped to delay the hearing on the motion for the appointment of a receiver and pre-judgement attachment for nearly one year. On the eve of the receiver taking control of their assets, the Debtors filed their first bankruptcy petition, which prevented the Objecting Creditors from beginning to collect on their judgment. The timing of the first bankruptcy strongly suggests that it, too, was filed in bad faith. *See Noreen,* 974 F.2d at 77; *Belden,* 144 B.R. at 1021.

During the pendency of their second bankruptcy, the Debtors manipulated the bankruptcy code and the automatic stay. *See Zellner,* 827 F.2d at 1227 (noting that one factor to consider is whether the debtor has unfairly manipulated the Bankruptcy Code). For instance, while forestalling the Objecting Creditors' collection efforts, the Debtors sought entry of the judgment in violation of the automatic stay in order to meet the qualifications for Chapter 13 relief. They also disregarded the automatic stay in order to file their notice of appeal.

After the dismissal of the second bankruptcy, the Objecting Creditors once again resumed their collection efforts. The Debtors further manipulated the bankruptcy process by arguing that the Objecting Creditors could not undertake these activities because the judgment, which the Debtors themselves sought to enter during the second bankruptcy proceeding, was invalid. This dispute led to another five month delay.

The sum of the activities prior to the filing of the present bankruptcy causes me to seriously doubt the Debtors' motivation and sincerity in seeking bankruptcy relief. *See LeMaire,* 898 F.2d at 1349 (stating that the debtor's motivation and sincerity in seeking relief is particularly relevant). As the Sixth Circuit noted in *Caldwell,* "[r]ather than a good faith effort to repay this debt, [I] see an unbroken pattern of deceit and delay." 895 F.2d at 1127.

Moreover, the Debtors actions in relation to the present filing also intimate bad faith. They have admitted that at least one reason for filing this bankruptcy petition was to avoid the payment of a supersedeas bond while the state court case is on appeal. By doing so they have avoided the Objecting Creditors' legitimate collection activities without posting the requisite bond. Several courts have held that using a Chapter 13 bankruptcy in this manner is an improper motivation and have dismissed the case for bad faith on that ground alone. *In re Harker,* 1996 WL 905910, at *4 (Bankr.S.D.Iowa 1996); *In re Roberts,* 117 B.R. 677, 678 (Bankr. N.D.Okla.1990). In addition, much like their first bankruptcy, the Debtors filed this petition on the eve of the Objecting Creditors successfully collecting against the judgment. The convenient timing of the filing is another display of bad faith. *See Noreen,* 974 F.2d at 77; *Belden,* 144 B.R. at 1021. Further, during this bankruptcy case, they have proposed several plans and have only grudgingly improved the treatment for the Objecting Creditors when challenged with objections and motions.

Finally, I find that the Debtors did not propose their plan in good faith. The plan, their third attempt, proposes that the Debtors will engage in a sale of their properties over the next five years. Such a prolonged time frame once again supports the contention that the Debtors are attempting to delay the Objecting Creditors rather than attempting to pay them. Given the current state of the real estate market in this area, I find that the most advantageous time to sell the properties is now. The Objecting Creditors should not be forced to wait for five years while bearing the risk that the value of the properties will decline. I find that the Debtors will have little incentive to maintain the value of the properties knowing that the

proceeds will go to the Objecting Creditors.

In addition, the Debtors' Third Modified Plan does not appear to meet the disposable income test. The Debtors gross over $7,000 per month from their rental properties. From just this business, the Debtors earn approximately $84,000 in gross revenues each year. Their monthly business and household expenses total about $4,600 per month, or $55,200 per year.[4] The difference leaves the Debtors with monthly disposable income of $2,400, or $28,800 annually. In addition, Mrs. Mattson nets approximately $1,800 from the Shaklee sales. This increases monthly disposable income to $4,200, or $50,400 annually.[5] Even if I include the $15,000 in deferred maintenance claimed by the Debtors, they still have $35,400 in disposable income for the year. This leaves an average of $2,950 in disposable income per month. The Debtors have only proposed a $1,500 monthly payment in their latest plan. Because there is an additional $1,450 in disposable income not paid into the plan, I find that the Debtors do not meet the disposable income test of § 1325(b).

The Debtors have attempted to manipulate this court and the bankruptcy process, they are attempting to discharge a debt that would not be dischargeable in a Chapter 7 case, and they do not have a sincere motivation in seeking Chapter 13 relief. I conclude that the Debtors actions are more consistent with an attempt to avoid paying the Objecting Creditors than with a legitimate attempt at reorganization. Based on the totality of the circumstances, the Debtors did not file their bankruptcy petition or their plan in good faith. Confirmation of the plan will be denied, and the case will be dismissed.

■ The Objecting Creditors also request that the Debtors be prohibited from

seeking further protection under the Bankruptcy Code. As I have already found, the Debtors have engaged in a consistent pattern of activities to frustrate collection of this judgment and manipulate the bankruptcy system. Based on the bad faith of the Debtors, I agree that a bar on their future ability to file a bankruptcy petition is warranted. *Jolly v. Great Western Bank (In re Jolly)*, 143 B.R. 383, 387 (E.D.Va.1992); *Lerch v. Federal Land Bank*, 94 B.R. 998, 1001 (N.D.Ill.1989); *In re McKissie*, 103 B.R. 189, 193 (Bankr. N.D.Ill.1989); *Shearson Lehman Hutton Mortgage Co. v. Hundley (In re Hundley)*, 103 B.R. 768, 771 (Bankr.E.D.Va.1989). In order to collect on their judgment the Objecting Creditors must undertake the time consuming process of levying and executing on the Debtors' nonexempt assets. Failing to prohibit the Debtors from future bankruptcy filings would give them an open opportunity to continue to frustrate the Objecting Creditors' attempts to collect. Accordingly, the Debtors will be barred from filing another bankruptcy case for nine months from the date of this order, August 29, 2000.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Confirmation of the Debtors' Second Modified Chapter 13 Plan is DENIED;

2. The Debtors' Chapter 13 bankruptcy case is DISMISSED;

3. The Debtors are barred from filing another bankruptcy case for nine months from the date of this order, August 29, 2000;

4. All other requests for relief are DENIED.

---

**4.** As noted above, I will not include the Debtors' legal expenses in the calculation because these expenses should be eliminated in the near future.

**5.** According to the information provided to the court, Mr. Mattson's used car business does not generate much income and may, in fact result in a small loss. Accordingly, I will not include it in these calculations.