**In re Roy WILCOX and Juanita Wilcox, Debtors.**

**No. 99–30998M.**

United States Bankruptcy Court, E.D. Arkansas, Jonesboro Division.

July 19, 2000.

---

Warren Dupwe, Jonesboro, AR, for Debtors.

Ralph Waddell, Jonesboro, AR, for Union Planters, N.A.

## ORDER

JAMES G. MIXON, Chief Judge.

Pending before the Court are an objection to confirmation and a motion to dismiss filed by Union Planters Bank ("UP") in the case of Roy and Juanita Wilcox ("Debtors"). The Bank alleges that the Debtors have not proposed their chapter 13 plan in good faith. After a hearing on February 14, 2000, the Court took the matter under advisement.

Jurisdiction is pursuant to 28 U.S.C. §§ 1334 & 157. The matters to be determined are core proceedings as exemplified by 28 U.S.C. § 157(b)(2)(A) & (L), and the Court may enter a final judgment in the case.

### FACTS

The events resulting in the Bank's allegations of lack of good faith occurred before the Debtors filed their voluntary petition for relief under the provisions of chapter 13 of the United States Bankruptcy Code on August 12, 1999. Prior to the bankruptcy filing, the Debtors owned and operated a used car dealership, the OK Car–Ral, in Jonesboro, Arkansas, from 1985 until 1999, when the business failed. Roy Wilcox supervised operation of the business, while Juanita Wilcox, a registered nurse, worked during the day at the car lot and at night as a nurse.

From 1985 through 1996, the Debtors obtained "floor plan" financing from Simmons Bank to purchase inventory for retail sale at the OK Car–Ral. From 1992 forward, the Debtors also had a similar floor plan arrangement with UP.

Under the financing arrangement between the parties, the Debtors would find a vehicle to purchase as inventory, UP would "screen" the car to determine its value, UP would advance or "floor plan" funds equivalent to the value of the vehicle to the Debtors, the Debtors would purchase the vehicle with the funds, and they would then deliver the title to UP as secu-

rity for the advance. UP would retain the title until the Debtors sold the vehicle to a customer, at which time the Debtors would pay off the floor plan amount owed to UP, obtain the title from UP, and complete the sale with the customer.

Occasionally, the Debtors would "borrow title," a procedure whereby the Debtors would give UP a check for a vehicle, obtain the title, and request UP to hold the check pending a sale or auction. If the sale was not consummated, the Debtors would return the title to UP and the Debtors' uncashed check would be returned to the Debtors.

In September 1997, the Debtors' business accounts at Simmons and UP were overdrawn by approximately $250,000.00. At that time, the Debtors took measures to balance the accounts, including borrowing money from friends and relatives, selling off inventory, cashing their IRA accounts, and refinancing their home. Monies from these sources were applied to the insufficient funds debt. The Debtors thereby reduced the overdraft debt to approximately $52,000.00.

The Debtors then agreed to an exclusive business relationship with UP at the request of one of UP's loan officers. UP believed the Debtors had previously kited checks between the two banks, and by serving as the only source of floor plan financing, UP hoped to better protect its position. On December 2, 1997, the Debtors borrowed from UP the sum of $360,000.00 for a line of credit for floor plan inventory financing for their business. The remaining overdraft debt was incorporated into the line of credit.

As collateral for the loan, the Debtors granted UP a perfected security interest in all of the Debtors' inventory, and UP and Roy Wilcox agreed to increase the estimated value of the existing inventory on the books to further secure the debt. The Debtors also granted UP a mortgage in the real estate where the business was located and liens in certain certificates of deposit and a life insurance policy belonging to the Debtors.

In connection with the transaction, the Debtors executed a loan agreement stating the following terms: that the loan proceeds would be used solely for the purchase of vehicles for resale at OK Car–Ral, that the amount lent on each vehicle financed by UP would be paid in full with certified or immediately available funds upon the resale of the vehicle, that no other floor plan arrangements with other lenders would be maintained for purchasing vehicles for the business unless UP refused to floor plan the vehicle, and that the amount advanced would be based on National Automobile Dealers Association values. (Pl.'s Ex. 1.)

Despite the new loan and debt reduction, the Debtors' business continued to experience financial difficulties. Additionally, Roy Wilcox developed a number of physical and mental ailments, including complications from diabetes, blood sugar imbalance, high blood pressure, high cholesterol, depression, and memory loss. His volatile and erratic behavior prompted the Debtors to hire a general manager to oversee the business operation. However, Roy Wilcox continued to direct the exchange of titles and checks under the floor plan arrangement with UP.

UP's allegations of bad faith stem from the Debtors' conduct after the December 2, 1997 loan. This conduct resulted in UP not being paid for six vehicles that UP financed and the Debtors sold to customers. The circumstances surrounding the financing and sales of the vehicles are as follows:

1. UP floor planned a 1995 Oldsmobile on February 24, 1998, for $11,075.00. The Debtors sold the vehicle on March 2,1998, for $10,350.00 to Hardcastle Chevrolet using a replacement title to complete the transaction, and the floor plan amount was paid on March 10, 1998. Even though the vehicle had been sold, the Debtors then floor planned the Oldsmobile again for $11,000 on April 14, 1998, presumably us-

ing the original title which the Debtors gave to UP as security. UP currently has in its possession the original certificate of title to the car, the floor planned amount has not been paid, and the Oldsmobile has been sold by the Debtors.

2. A 1992 Pontiac Sunbird was floor planned by UP on February 24, 1998, for $2500.00. The Debtors' employee picked up the title on March 12, 1998, giving UP a check in payment of the floor planned amount. The Debtors sold the car to Herring Auto Sales for $2350.00 on March 12, 1998. There were insufficient funds to cover the check given to UP, and UP has never been paid the floor planned amount advanced to the Debtors.

3. UP floor planned a 1996 Lincoln Continental on February 6, 1998, for $20,300.00 The Debtors' employee picked up the title on March 5, 1998, giving UP a check for $20,300.00 to pay off the advance on the Lincoln. Also on March 5, Simmons Bank lent the Debtors the sum of $18,001.00, with the Lincoln used as collateral. The Debtors deposited the sum of $18,001.00 into their business account. The Debtors sold the car on April 21, 1998, for $17,725.00. This sum was transferred to Simmons to pay the March 5 loan. There were insufficient funds to cover the $20,3000.00 check to UP, and UP has never been reimbursed for the $20,300.00 advanced to purchase the Lincoln.

4. OK Car–Ral sold a 1992 Mercury Grand Marquis to Kearn and Melissa Murray on July 22, 1997, and the retail sales contract was purchased by UP. Subsequently, on December 4, 1997, the same vehicle was floor planned by UP for $8000.00. UP still holds the original title but the vehicle is no longer in the Debtors' possession.

5. UP floor planned a 1982 Datsun pickup truck on September 18, 1997, for $2875.00. The Debtors borrowed the title on March 18, 1998, giving UP a check for $2875.00. The truck was sold to Flowers Incorporated for $1,995.00 on the same day. UP has never been paid for the sum advanced on the truck, and the check it holds from the Debtors is worthless.

6. Roy Wilcox gave UP a note for $13,750.00 secured by a 1993 Jeep Cherokee. The note was later paid by the Debtors. In an interim transaction, UP floor planned the Jeep on October 14, 1997, for $13,675.00. The Jeep was subsequently sold by the Debtors to Roger and Linda Mahaffey by use of replacement title for $10,000.000. UP still holds the original title and has never been paid the floor planned amount.

In June 1998, UP suspended the line of credit and attempted to collect the amount owed on the loan. The Debtors ceased operating the OK Car–Ral, sold the real estate, fixtures and equipment of the business, and liquidated the certificates of deposit, applying the proceeds to the debt owed to UP. After all collateral was liquidated and applied to the debt, UP charged off $70,954.45 on the loan to the Debtors.

The Debtors filed for bankruptcy under the provisions of chapter 13 on August 12, 1999, scheduling an unsecured, nonpriority debt to UP in the sum of $77,567.89 and characterizing $13,675.00 of that sum as a secured debt to be paid with interest at the rate of $280.00 a month over the life of the plan. Total unsecured, nonpriority debt is listed at $211,004.06, with unsecured, nonpriority creditors to receive a pro-rata dividend.[1] After secured, administrative, and priority claims are paid, dividends to unsecured creditors will be de minimus. The Debtors propose to fund the plan with their entire disposable income of $510.79 a month for sixty months. The sources of the plan payments are Juanita Wilcox's wages of $2115.57 and Roy Wilcox's part-time earnings of $200.00 a month. The Debtors have surrendered

---

1. At the hearing on February 14, the Court indicated that the plan would not be confirmed as long as the Debtors proposed to treat a portion of UP's debt as secured when the collateral securing the claim had already been sold.

their home in lieu of foreclosure and also have surrendered rental property.

At the hearing on February 14, testimony from the Debtors and Portia Machon, an employee of OK Car–Ral, indicated that Roy Wilcox directed the exchange of titles and checks between the business and UP and supplied the paperwork necessary for each transaction. Roy Wilcox testified that he inadvertently sent titles to UP to finance vehicles that had already been sold or were subsequently sold by replacement title. Furthermore, he stated that it was a common practice between his business and UP that checks covered by insufficient funds would occasionally be exchanged for titles.

Juanita Wilcox acknowledged at the hearing that the Jeep was sold out of trust and that was the reason the Debtors were proposing to pay the amount owed on the vehicle as a secured claim. She testified that she had been unaware of other vehicles being sold out of trust until UP's officials brought the problem to her attention. Furthermore, she stated that UP had contributed to the failure of the business by making it more difficult for OK Car–Ral customers to get financing for the retail price of the car.

UP objects to confirmation of the plan and argues that the Debtors' case should be dismissed for lack of good faith because they attempted to mislead the Court at trial and unfairly manipulate the Bankruptcy Code by paying a small portion of the debt owed to UP. UP also contends that the debt would be nondischargeable under chapter 7, another indication of the Debtors' lack of good faith.

The Debtors argue that the type of debt owed to UP is dischargeable in a chapter 13 bankruptcy as long as the plan has been proposed in good faith. They contend that they have exhibited good faith by liquidating their assets to pay the debt to UP, stating their debts and expenses accurately, refraining from fraudulent misrepresentations or unfair manipulation of the bankruptcy code, and pledging a substantial portion of their income to fund a sixty-month plan. In any event, the Debtors stress that their prepetition conduct was not so egregious as to warrant dismissal.

## DISCUSSION

■ The Bankruptcy Code requires a debtor in chapter 13 to propose a plan in good faith. 11 U.S.C. § 1325(a)(3) (1994). The term "good faith" is not defined by the Code, and courts making a good faith inquiry must "judge each case on its own facts after considering all the circumstances of the case." *United States v. Estus (In re Estus)*, 695 F.2d 311, 316 (8th Cir.1982). See also, *Noreen v. Slattengren (In re Noreen)*, 974 F.2d 75, 76 (8th Cir. 1992) (applying totality of the circumstances approach in good faith inquiry) and *Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1349 (8th Cir.1990) (same).

The court in *Estus* listed a number of factors for courts to consider under the totality of the circumstances approach. Many of the financially-based factors were subsumed by the 1984 enactment of Section 1325(b), such that the good faith inquiry is now a narrower and more subjective issue. *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir.1987).

■ Among the factors now emphasized by the Eighth Circuit to determine good faith as a subjective inquiry are the following:

Whether the debtor has accurately stated his debts and expenses on his bankruptcy statements and schedules. *Zellner*, 827 F.2d at 1227 (citing *Estus*, 695 F.2d at 317; *In re Johnson*, 708 F.2d 865, 868 (2d Cir. 1983); *Barnes v. Whelan*, 689 F.2d 193, 200 (D.C.Cir.1982); *In re Rimgale*, 669 F.2d 426, 432 (7th Cir.1982)).

Whether the debtor has made any fraudulent misrepresentation in connection with the case to mislead the Bankruptcy Court or his creditors. *Zellner*, 827 F.2d at 1227 (citations omitted).

Whether the debtor has unfairly manipulated the Bankruptcy Code in any aspect of his plan. *Zellner,* 827 F.2d at 1227 (citations omitted).

Whether a specific debt treated in the plan would be nondischargeable in a chapter 7 case. *LeMaire,* 898 F.2d at 1349 (citing *Estus,* 695 F.2d at 317).

The type of debts which the debtor seeks to discharge in the chapter 13 case. *LeMaire,* 898 F.2d at 1349 (citing *Estus,* 695 F.2d at 317).

The debtor's motivations and sincerity in seeking chapter 13 relief. *LeMaire,* 898 F.2d at 1349 (citing *Estus,* 695 F.2d at 317).

 Thus, confirmation of a chapter 13 plan may be denied on the basis of prepetition conduct, although how each factor cited above will be weighed will depend on the circumstances of a particular case. *LeMaire,* 898 F.2d at 1351 n. 7 (quoting *Estus,* 695 F.2d at 317). For public policy reasons, courts weighing the facts and circumstances of a case may give added weight to the existence of a debt that would have been nondischargeable in a chapter 7 case if the debt arose from prepetition conduct of a particularly egregious nature. See, e.g., *Noreen,* 974 F.2d at 77 n. 6 (citing public policy as support for bad faith finding when debtor attempted to discharge debt resulting from sexual assault) and *LeMaire,* 898 F.2d at 1353 (finding strong public policy prohibiting discharge of debt for willful and malicious injury resulting from attempted murder).

 The Court will address each factor in turn below.

1. Accuracy of the Debtors' bankruptcy statements and schedules.

Intentional inaccuracy in the statements and schedules filed by a chapter 13 debtor has frequently been a factor in denying confirmation or dismissing a case on the basis of bad faith. See, e.g., *In re Buchanan,* 225 B.R. 672 (Bankr.D.Minn.1998) (dismissing chapter 13 case for failure to disclose property and understatement of assets and income on schedules), *aff'd sub nom. Buchanan v. U.S.,* No. 98–2291, 1999 WL 314819 (D.Minn. Apr. 2, 1999); *In re Martin,* 199 B.R. 175 (Bankr. E.D.Ark.1996) (finding debtor's plan lacked good faith because schedules were false and income and property were undisclosed).

The Debtors' statements and schedules appear to be accurate with the exception noted by the Court in the February 14 hearing; that is, a portion of UP's debt, $13,675.00, is characterized as secured when the collateral has been sold and there is no other security for any portion of the remaining indebtedness to UP. Juanita Wilcox testified that she and her husband planned to pay that amount as a secured claim because it represented the debt owed on the 1993 Jeep that the Debtors acknowledged had been sold out of trust.

However, this inaccuracy does not necessarily evidence bad faith. To the contrary, the inference could be drawn that the Debtors are attempting to partially rectify their wrong by giving UP a preferred position as a partially secured creditor, even though UP is not entitled to such treatment under the Bankruptcy Code. Therefore, the Court finds that the Debtors' statements and schedules are accurate and that this factor weighs in the Debtor's favor.

2. Fraudulent misrepresentations to mislead the Bankruptcy Court or creditors.

 Misrepresentations to mislead the court or creditors may take many forms, including the filing of falsified schedules and statements or attempting to mislead the court or trustee while under oath. See, e.g., *Nielsen v. DLC Inv. Inc. (In re Nielsen),* 211 B.R. 19, 22 (8th Cir. BAP 1997) (noting trial court's finding of lack of candor in debtor who failed to schedule vehicles, real property, and other assets);

*In re Kilker*, 155 B.R. 201, 204 (Bankr. W.D.Ark.1993) (finding bad faith when debtor was evasive about inaccurate and contradictory schedules).

Although the Debtors' petition and schedules were basically accurate as discussed above, the Debtors were less than candid with the Court during the February 14 hearing with regard to the debt owed to UP. Roy Wilcox refused to admit, under oath, that he intentionally sold vehicles out of trust, yet his explanation as to how the collateral disappeared was confusing, evasive, and unconvincing. He never took responsibility or showed remorse for what obviously were intentional acts that damaged UP.

Juanita Wilcox was more forthright, admitting under oath that vehicles were sold out of trust. The Court accepts her assertions that she was unaware of vehicles being sold out of trust until after the fact. Nevertheless, she supported her husband's position that his acts were inadvertent and that the course of dealing between UP and the Debtors was that UP would occasionally exchange titles for insufficient funds checks that UP would hold until the Debtors could later cover the checks.

The Court finds that when Roy Wilcox was given the opportunity to tell the truth about his dealings with UP, he chose instead to make excuses and deny obvious facts. Although Juanita Wilcox was more forthcoming, her testimony failed to neutralize the evasive and misleading tenor of Roy Wilcox's testimony. On balance, Roy Wilcox's lack of credibility weighs against a finding of good faith.

3. Whether the Debtors have unfairly manipulated the Bankruptcy Code.

Courts treat this factor as a catchall and base a finding of unfair manipulation of the Bankruptcy Code on a variety of circumstances ranging from inaccurate schedules and egregious prepetition conduct to serial filings. *In re Buchanan*, 225 B.R. 672, 678 (Bankr.D.Minn.1998) (finding unfair manipulation demonstrated by asset transfers and serial bankruptcy filings), *aff'd sub nom. Buchanan v. U.S.*, No. 98–2291, 1999 WL 314819 (D.Minn. Apr. 2, 1999); *In re Martin*, 199 B.R. 175, 177 (Bankr.E.D.Ark. 1996) (ruling debtor unfairly manipulated the Code by omitting income for chapter 7 purposes but listing income on amended chapter 13 schedules).

UP argues that the Debtors have unfairly manipulated the Bankruptcy Code by scheduling a portion of UP's debt as secured. UP argues that in so doing, the Debtors were forcing UP to make a difficult choice. That choice was whether to accept $13,675.00 plus 10% interest over the life of the plan or risk receiving less if UP's objection to confirmation failed and the Court required the Debtors to modify UP's treatment to conform to Bankruptcy Code requirements for unsecured creditors. Indeed, the Court has commented in open court that the plan will not be confirmed because of UP's present treatment as partially secured.

The Court views UP's treatment as one of strategy on the part of the Debtors rather than unfair manipulation and as stated previously, an attempt to favor rather than injure UP through the plan. Therefore, this circumstance does not support a finding of unfair manipulation

4. Whether a particular debt would be nondischargeable in a case under chapter 7.

Courts have found bad faith when chapter 13 debtors propose to discharge a debt otherwise nondischargeable in a chapter 7 case. See, e.g., *In re Kurtz*, 238 B.R. 826, 830 (Bankr.D.N.D.1999) (finding bad faith when plan paid de minimus distribution to creditor holding judgment for assault and debtor had previously transferred assets); *In re Sitarz*, 150 B.R. 710, 723 (Bankr. D.Minn.1993) (ruling plan was proposed in bad faith where debt to be readjusted would have been nondischargeable under the provisions of chapter 7).

The Debtors schedule an unsecured, nonpriority debt to UP of $77,567.89, and $58,350.00 of that sum is the amount UP advanced to finance the six vehicles that the Debtors sold out of trust. Roy Wilcox, through his agent, presented UP with titles to obtain financing on an Oldsmobile and a Mercury, both of which had already been sold so that no collateral existed. Concerning the Pontiac, Lincoln, and Datsun, Roy Wilcox "borrowed" the titles of each in exchange for worthless checks, then sold the cars without redeeming the checks with the sale proceeds. Roy Wilcox sold the Jeep using a duplicate title but did not remit the financed sum to UP, which continued to hold the original title.

In each instance, Roy Wilcox's conduct, if tested under a chapter 7 dischargeability action, probably rises to the level of willful and malicious injury. Debts arising from such conduct are nondischargeable in a chapter 7 case under 11 U.S.C. § 523(a)(6). UP has made a prima facie case for nondischargeability under this provision.

■ As stated above, a plan is not per se filed in bad faith merely because it proposes to discharge a debt that is nondischargeable in a chapter 7; in fact, the Bankruptcy Code specifically allows chapter 13 debtors to discharge debts for willful and malicious injury provided the plan is proposed in good faith. While a chapter 13 debtor's prepetition conduct is not determinative on the issue of good faith, it is relevant to the totality of circumstances analysis. Here, the fact that a debt of $58,350.00, or approximately 28% of the nonpriority, unsecured debts, would probably be nondischargeable in a chapter 7 case weighs against a finding of good faith and also supports an inference of unfair manipulation of the Bankruptcy Code.

Nevertheless, the Court notes that fraud, embezzlement, conversion, and similar offenses dealing with property, while resulting in nondischargeable debts in a chapter 7 case, are not as "morally repugnant" as attempted murder and sexual assault, the type of prepetition conduct supporting rulings of bad faith in binding Eighth Circuit Court of Appeals precedents. *In re Nipper,* 224 B.R. 756, 759 (Bankr.E.D.Mo.1998) (distinguishing *LeMaire* and *Noreen* in finding good faith although the plan proposed discharging portion of debt incurred by embezzlement). See, also, *In re Harlan,* 179 B.R. 133, 141 (Bankr.W.D.Ark.1995)(finding good faith plan despite discharge of judgment debt for embezzlement). Thus, this factor weighs against the Debtors, but not heavily.

5. The type of debts which the debtor seeks to discharge.

■ Relevant to a consideration of the type of debts to be discharged is a discussion of the identity of the creditor, the nature of the relationship between the parties, and any personal impact of the debtor's conduct on an individual creditor. *In re Sitarz,* 150 B.R. 710, 722–23 (Bankr. D.Minn.1993) (finding bad faith where debtor's conduct was a personal betrayal leading to financial ruin of two innocent individuals).

Here, the creditor is a financial institution, not an individual who might have suffered extreme hardship from a similar loss. Furthermore, the indebtedness to UP arose from a commercial relationship between the parties and did not result from the betrayal of a close personal relationship. Each party negotiated an arm's length agreement, with UP fully aware of the Debtors' financial problems and their history of abusively overdrawing their accounts at UP and Simmons Bank. Although the type of debt owed to UP tends to support a finding of bad faith because the debt would probably be nondischargeable in a chapter 7 case, UP's identity and bargaining power in the relationship decrease the weight the Court will allocate to this factor.

6. The debtor's motivations and sincerity in seeking chapter 13 relief.

■ In assessing a debtor's motivations and sincerity in seeking chapter 13

relief, courts have examined such facts as the degree to which creditors are made whole through plan payments, the length of the plan, the amount of disposable income allocated to the plan, and the debtor's need for relief. See, e.g., *In re Nottingham*, 228 B.R. 316, 320 (Bankr. M.D.Fla.1998) (holding that despite small payout to creditors, debtor's proposed sixty-month plan was filed in good faith); *In re Buchanan*, 225 B.R. 672, 678 (Bankr. D.Minn.1998) (finding lack of good faith where debtor was motivated only by the desire to retain assets and not to repay creditors), *aff'd sub nom. Buchanan v. U.S.*, No. 98–2291, 1999 WL 314819 (D.Minn. Apr. 2, 1999); *In re Nipper*, 224 B.R. 756, 759 (Bankr.E.D.Mo.1998) (observing that debtor who committed entire disposable income to the plan evidenced sincerity and proper motivation); *In re Corino*, 191 B.R. 283, 291 (Bankr.N.D.N.Y. 1995) (ruling that debtor's having pledged all disposable income to five-year plan and her need for a fresh start exhibited good faith).

The Court notes that under the current plan, UP would receive approximately 18% of the present value of the total unsecured debt owed to UP and that the plan would pay other unsecured creditors a de minimus distribution. A small payout to general, unsecured creditors can be evidence of unfair manipulation. This is so because when a debtor receives a broader chapter 13 discharge but unsecured creditors receive only slightly more than would have been paid in a chapter 7 case, the purpose of a chapter 13 plan, which is to repay creditors, is not being served.

However, this relatively small distribution to unsecured creditors is partially offset by the fact that the Debtors are dedicating all disposable income to a sixty month plan to repay debts. They propose a $510.00 plan payment, approximately 22% of their combined monthly net income. This payment is possible because the Debtors have reduced their living expenses to basic necessities. The Debtors have further maximized the dividend to the general unsecured creditors by extending their plan by twenty-four months, something they are not required to do under the Bankruptcy Code. Thus, while the payments to general unsecured creditors are relatively small, those payments clearly demonstrate a sincere effort to honor their obligations.

Finally, there is no dispute that these Debtors have a genuine need for chapter 13 relief. In an attempt to pare expenses and to satisfy UP's claim, they have relinquished virtually all of their property to their creditors, retaining only an automobile valued at $4000.00 and some exempt personal belongings.

Furthermore, if the Debtors lose the protection of the bankruptcy laws, they will be liable for more than $56,000.00 in credit card bills and $63,000.00 in personal loans from individuals, in addition to the obligation to UP and other creditors. The Debtors' choice of chapter 13 means that the unsecured creditors, including the Debtors' friends and relatives, will receive at least some payment, whereas it appears unlikely there would have been any distribution by a trustee in a chapter 7 case. The fact that the Debtors are willing to designate more than one-fifth of their income to pay their debts is as important as the fact that they are equally motivated to avoid an adverse chapter 7 nondischargeability determination.

The Debtors' sincerity and motivation weigh in favor of confirming the plan. The plan length, plan payment, and need for chapter 13 relief are persuasive circumstances in this determination.

## CONCLUSION

As the Court commented at trial, this is a close case. On the one hand, the Debtors' accurate schedules, sincerity, and motivation support a finding of good faith. On the other hand, their prepetition conduct and their misleading testimony could

be construed as an unfair manipulation of the Bankruptcy Code. After considering the factors set out above, the Court finds that the Debtors have proposed their plan in good faith. Their efforts to fund a sixty-month plan with all available disposable income, their accurate schedules, and their genuine need for chapter 13 relief outweigh the detrimental effect of their prepetition conduct. These debtors have nothing left to give to UP except the payments under the plan. To deprive them of a fresh start would be contrary to the express purposes of the Bankruptcy Code.

Therefore, for the reasons stated, the motion to dismiss is denied and the objection to confirmation is sustained with 20 days to modify in accordance with this order.

IT IS SO ORDERED.