**In re William Reece LANCASTER, Debtor.**

No. 01–31308–JWV.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

July 12, 2002.

---

13. Pl.Ex. # 13.

14. 150 B.R. 733 (Bankr.W.D.Mo.1993).

15. *Id.* at 736.

16. *Smith v. Dirsmith (In re Dirsmith)*, 152 B.R. 341, 344 (Bankr.M.D.Fla.1993).

17. *Id.*

470

Norman E. Rouse, Collins, Webster & Rouse, Joplin, MO, for Debtor.

Bruce E. Hunt, Burkart & Hunt, PC, Springfield, MO, for American Family Mutual Insurance Co.

J. Michael Riehn, Cassville, MO, for Johnny Weathers and J. Michael Riehn.

### MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

This case presents the related questions of whether the Debtor, William Reece Lancaster, filed these Chapter 13 proceedings and his proposed Chapter 13 Plan in good faith.

Lancaster ("Lancaster" or "Debtor") filed a voluntary Chapter 13 petition on December 13, 2001. At the same time, he filed a Chapter 13 Plan ("Plan") in which he proposed to pay $150.00 a month for 36 months, which would be distributed *pro rata* to the four unsecured creditors listed in his bankruptcy schedules. Two of those

creditors—Johnny Weathers and his attorney, J. Michael Riehn—filed a combined Motion to Dismiss and Objection to Confirmation of Plan on January 28, 2002. American Family Mutual Insurance Company joined in the Motion and Objection on February 4, 2002.[1] The Court held a hearing on both issues at the Jasper County Courthouse in Carthage, Missouri, on May 21, 2002, and took the matter under advisement. The Court has considered the briefs filed by the parties, has reviewed the evidence and the relevant case law, and is now ready to rule.

For the reasons stated below, the Court will deny the Movants' Motion to Dismiss the Chapter 13 proceedings, but will sustain their Objection to Confirmation of Plan and will grant the Debtor 20 days in which to file an amended plan.

## FACTUAL BACKGROUND AND FINDINGS

The events giving rise to this Adversary Proceeding have their origin in the marital discord of the Debtor and his wife, Kay Lancaster ("Mrs.Lancaster"), and which culminated in an explosion on October 23, 1998, that destroyed the home of Johnny Weathers, one of the Movants ("Weathers").

At some time prior to October 23, 1998, Lancaster and his wife had separated and were living apart. Weathers and Mrs. Lancaster apparently had begun seeing each other, and Lancaster learned of this some time before October 23. Approximately two days before the explosion, Mrs. Lancaster telephoned Weathers and told

him that Lancaster had threatened to kill Weathers or burn his house down.[2] Then, on October 23, at about 1 o'clock in the afternoon, Lancaster went to Weathers's house near Washburn, Missouri, hoping (he said) to find his wife and Weathers there and confront them about their seeing each other. He entered the house but found no one there.[3] Lancaster admittedly went into a rage and decided he would damage Weathers's house.

In the basement, Lancaster found Weathers's motorcycle and, using his pocketknife, cut the brake line, because he had heard talk that his wife and Weathers might be going on a ride on the motorcycle. He then went to the kitchen where he pulled the refrigerator from the wall and broke the Freon line. Next, Lancaster broke the water supply line under the kitchen sink, causing the water to run freely into the house.

Hotly disputed at trial was whether Lancaster disconnected a half-inch copper pipe that ran from Weathers's propane tank at the back of the house to the furnace in the basement, and that supplied propane gas for the furnace. Lancaster denied that he had disconnected the pipe. Weathers, understandably, argued that it was likely that Lancaster had disconnected the pipe because of the other damage that Lancaster did to the house and because of the threats that Lancaster had made just a couple of days earlier. The furnace was located approximately 20 feet from the motorcycle on which the brake line was cut. Counsel for Weathers also pointed

---

1. The creditors will be referred to collectively as "Movants."

2. Weathers later told one of the investigating officers that Lancaster had threatened to "blow his head off and burn his house down." Kirk Mackey Deposition, p. 26.

3. Weathers testified that he had locked the house securely when he left for work earlier in the day, and that he and sheriff's deputies found evidence that the door had been pried open to gain entry. Lancaster asserted that the front door was unlocked when he entered the house. This issue is not critical to the Court's decision.

out that a state court jury, in a civil action filed against Lancaster by Weathers, had found that Lancaster had intentionally disconnected the pipe.

While the Court does not believe that a finding that Lancaster disconnected the gas line is essential to the Court's decision, the Court nevertheless believes that it is more likely than not that Lancaster did, indeed, disconnect the gas line. Lancaster had, just days earlier, threatened to kill Weathers or burn his house down, either of which might be accomplished by disconnecting the propane gas line to the furnace. He admittedly had cut the brake line on Weathers's motorcycle, which was parked in the basement some 20 feet from the furnace. He admittedly had broken the Freon line on the refrigerator, which allowed another hazardous (if not deadly) gas to escape into the house. A pair of channel lock pliers was found on the floor of the furnace room, and an investigator for the State Fire Marshal's office determined that the gas line fittings had been disconnected before the explosion. Considering these facts and the other destruction wreaked by Lancaster in the brief time he was in the house, it seems most likely that he also disconnected the propane gas line. That action could well have resulted in someone's death.

According to Lancaster, he was in Weathers's house for only 10 minutes, leaving at about 1:10 p.m. When Weathers returned home at approximately 5 p.m., he discovered water running down the stairs and coming through the first floor ceiling. He shut off the main water supply and called his parents and neighbors who lived nearby to come and help him clean up the water. At some point, Weathers discovered that the source of the water in the house was the broken water supply line under the kitchen sink. He then decided to call the law enforcement authorities, who arrived at about 6:30 p.m.

Weathers testified that he, his neighbor, and the sheriff's deputies at one time or another noticed a "funny smell" that smelled like propane, but that they dismissed it as sewer gas because of the broken plastic pipes under the kitchen sink. Inexplicably, the sheriff's deputies never made any further investigation to determine the source of the smell.[4] Weathers, his parents, and his neighbors worked until almost 8 p.m. attempting to clean up the excess water and dry out the carpets; they opened the windows, placed several box fans throughout the house, and turned on the ceiling fans.

Weathers went to his parents' house nearby to eat dinner.[5] He then returned to his home to change clothes and leave

4. Kirk Mackey, the first officer dispatched to the house on the report of the break-in, said there was "too much...smell of the sewer" to determine what the gaseous smell was. Mackey Deposition, pp. 13–14. Mackey never noticed a smell of propane gas although he went throughout the house. Mackey Deposition. p. 31. However, Mark Kooper, a reserve deputy, stated that he noticed a propane gas smell as he was walking toward the house upon his and Mackey's arrival at about 6:30 p.m. He spoke to Weathers's mother about it, and she told Kooper she believed it was sewer gas because the water pipes had been broken.

Kooper "didn't think about it anymore after that." Kooper Deposition, p. 8.

5. Weathers testified that, at approximately 8 p.m., he removed his motorcycle from the basement and set off on it for his parents' house a short distance away. He testified that he was stopped at the end of his driveway by sheriff's deputies, who told him that Lancaster had admitted cutting the brake line on the motorcycle. This could not be correct because Lancaster had not even been questioned by the authorities at that time, according to the testimony of the sheriff's deputies. However, this discrepancy is not material.

the house to visit Lancaster's wife. Weathers wanted it to appear that someone was in the house, so he turned on several lights and the television. He also either turned on the furnace or turned up the thermostat so that the furnace, which had an electric ignition, would begin to heat the house and help dry it out. As he prepared to leave the house, he flipped a light switch and an explosion occurred. Weathers was thrown several feet, his hair was singed, and he suffered extensive bruises and a cut on his arm. The injuries were relatively minor and Weathers did not require medical treatment.

The house, however, was another story, as the saying goes. In an understatement, Weathers testified that "[i]t was blowed up." Though the walls of the building were still standing, the house was totally destroyed. Doors and windows were blown out, deck supports and railings were blown away or broken, a porch was collapsed, the brick was blown off the outside walls, and debris was scattered in a wide area around the house. The house was, in short, unfit for human habitation.

Criminal charges were filed against Lancaster the next day, and on December 30, 1998, Lancaster pleaded guilty to a charge of burglary in the second degree, a Class C felony under Missouri law. He was given a suspended imposition of sentence and placed on probation, which has now been completed. He was not ordered to pay any restitution to Weathers.

On that same day, December 30, 1998, Weathers filed a civil lawsuit against Lancaster in the Barry County Circuit Court. American Family Mutual Insurance Company ("American Family"), the company that insured the dwelling and contents, later intervened in that lawsuit. The case was tried to a jury in February 2000, and the jury returned verdicts in favor of Weathers and American Family. In sepa-

rate judgments, and on the basis of the jury's verdicts, the Circuit Court awarded Weathers damages of $72,120.00 on a claim for trespass and $1,000.00 on a claim for battery, and awarded American Family $103,745.63 for damages to Weathers's property. These judgments were not appealed by Lancaster.

Despite numerous and vigorous efforts to collect on the judgments, the Movants were unable to collect anything, and Lancaster made no voluntary payments on the judgments. The Movants served various post-judgment interrogatories, ran garnishments, and conducted a judgment debtor examination of Lancaster. A garnishment was outstanding when Lancaster filed his bankruptcy petition on December 13, 2001. The Movants' Motion to Dismiss and Objections to Confirmation followed.

## DISCUSSION

The Movants argue that confirmation of Lancaster's Chapter 13 Plan should be denied and his Chapter 13 case dismissed because (1) the debts for which Lancaster seeks bankruptcy protection arose from his intentional, criminal conduct in damaging Weathers's property and these debts would be nondischargeable in Chapter 7 pursuant to 11 U.S.C. § 523(a)(6), and (2) Lancaster lacks the proper motivation and sincerity in seeking bankruptcy protection because (a) he evaded or delayed the Movants' collection efforts for approximately 16 months after the state court judgments were entered, and (b) he failed to make any payments to the Movants between the time the state court judgments were entered and the time the bankruptcy petition was filed, and he had not yet made any Chapter 13 plan payments to the Trustee at the time the Movants filed their Motion. In short, they assert that Lancaster has

not met the good faith requirements of the Bankruptcy Code in filing his Chapter 13 petition and plan.

There are two instances in a Chapter 13 case when good faith becomes an issue. First, 11 U.S.C. § 1307(c) provides that the court may dismiss a case or convert it for cause, and numerous courts have held that filing a Chapter 13 petition in bad faith is cause for conversion or dismissal under § 1307(c). Second, 11 U.S.C. § 1325(a)(3) provides that, in order to be confirmed, a Chapter 13 plan must be proposed in good faith and not by any means forbidden by law. Neither the Bankruptcy Code nor its legislative history defines the term "good faith," and partly as a result the search for its meaning has generated no small amount of litigation and court decisions. The issue often arises—as it does in this instance—in those cases where a debtor seeks to use Chapter 13's "super-discharge" to discharge a debt that would be nondischargeable in Chapter 7. *In re Virden*, 279 B.R. 401, 407–08 (Bankr. D.Mass.2002).

■ The difference between good faith in filing a case and good faith in proposing a plan is relatively minor, and the evidence on both issues may properly be considered together. *In re Mattson*, 241 B.R. 629, 635 (Bankr.D.Minn.1999). In the Eighth Circuit, the Court of Appeals has articulated the same standard for finding bad faith in both instances. *See Molitor v. Eidson (In re Molitor)*, 76 F.3d 218, 220–21 (8th Cir.1996) (dismissal), and *Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1349 (8th Cir.1990) (plan confirmation). Perhaps the only real distinction between the two is in the burden of proof. Under § 1307(c), the objecting creditor bears the burden of proof, whereas under § 1325(a)(3), the debtor bears the burden. *In re Love*, 957 F.2d 1350, 1355 (7th Cir.1992).

■ Although the underlying factors have been periodically analyzed, it seems clear that, in passing on the question of good faith in Chapter 13 cases, this Court should follow the totality of the circumstances analysis adopted by the Eighth Circuit Court of Appeals in *United States v. Estus (In re Estus)*, 695 F.2d 311 (8th Cir.1982), and as further explicated in *Education Assistance Corp. v. Zellner*, 827 F.2d 1222 (8th Cir.1987), *Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346 (8th Cir.1990), *Noreen v. Slattengren*, 974 F.2d 75 (8th Cir.1992), and *Molitor v. Eidson (In re Molitor)*, 76 F.3d 218 (8th Cir.1996).

Prior to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984), the Court of Appeals focused its analysis on whether the plan proposed by the debtor "constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *LeMaire*, 898 F.2d at 1348, quoting *Estus*, 695 F.2d at 316. This required looking to the totality of circumstances to discern whether good faith existed. *LeMaire*, 898 F.2d at 1348. In *Estus*, the Court outlined several non-exclusive factors to be considered when making a determination as to the existence of good faith in the filing of a Chapter 13 plan. Many of the factors addressed the debtor's ability to pay and whether the plan proposed a fair economic treatment for creditors, while others were directed at the debtor's integrity in the bankruptcy process. *Estus*, 695 F.2d at 317; *Mattson*, 241 B.R. at 636.

However, after *Estus* was decided, the Bankruptcy Amendments and Federal Judgeship Act of 1984 added a new § 1325(b) which authorized courts to confirm a plan if all of the debtor's disposable income for three years was applied to

make payments under the plan.[6] 11 U.S.C. § 1325(b); *LeMaire*, 898 F.2d at 1349. In *Zellner*, the Court of Appeals considered the effect of the new section on the Court's good faith analysis in *Estus*. It concluded that most of the economic factors that had been outlined for consideration in *Estus* were subsumed in the "ability to pay" criteria of the new § 1325(b), and therefore the focus was narrowed to a consideration of just three factors: (1) whether the debtor has stated his debts and expenses accurately; (2) whether the debtor has made any fraudulent representations to mislead the bankruptcy court; and (3) whether the debtor has unfairly manipulated the Bankruptcy Code. *Zellner*, 827 F.2d at 1227; *see LeMaire*, 898 F.2d at 1349.

Two of the factors enumerated by *Estus* in the good faith analysis are whether the debt to be discharged in the Chapter 13 proceeding is nondischargeable in Chapter 7 and the debtor's motivation and sincerity in seeking Chapter 13 relief. These two factors were the focus of the Court's decision in *LeMaire*, which is clearly the most notorious of the Chapter 13 good faith cases in the Eighth Circuit, and perhaps in the country.[7] The Court of Appeals first confirmed that the totality of the circumstances test announced in *Estus* remained the proper standard for the good faith inquiry. *LeMaire*, 898 F.2d at 1352, fn. 8. The Court also recognized that a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims. *LeMaire*, 898 F.2d at 1352. At the same time, the Court said that consideration must also be given to the policies underlying the Bankruptcy Code, notably the primary purpose of collecting and distributing to creditors the assets of the debtor and the secondary purpose of giving honest debtors (but not dishonest debtors) the opportunity to reinstate themselves in the business world. *LeMaire*, 898 F.2d at 1352. Because it determined that there is a "particularly strong policy prohibiting the discharge of a debt resulting from a willful and malicious injury following an attempted murder," and because it found that the bankruptcy court had not given sufficient consideration to this factor, the Court of Appeals refused to allow confirmation of LeMaire's proposed plan.[8]

---

6. 11 U.S.C. § 1325(b)(1) now provides:

If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

\* \* \* \* \* \*

(B) the plan provides that all of the debtor's disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

7. LeMaire, after lying in wait for Handeen to pick up his son, fired nine shots with a bolt action rifle at Handeen, striking him five times. LeMaire confessed that he intended to kill Handeen. LeMaire pleaded guilty to a charge of aggravated assault and was sentenced to imprisonment for a term of one to 10 years. Handeen sued LeMaire and obtained a consent judgment of approximately $50,000.00. After his release from prison, LeMaire obtained a doctorate degree in experimental behavioral pharmacology from the University of Minnesota. When LeMaire failed to pay the judgment Handeen had obtained, Handeen began garnishment proceedings, and LeMaire filed a Chapter 13 bankruptcy. Handeen objected to the Chapter 13 plan proposed by LeMaire. The bankruptcy court confirmed the plan over Handeen's objections, but eventually the Court of Appeals reversed, holding that the bankruptcy court's finding that LeMaire had filed his plan in good faith was clearly erroneous.

8. The particularly egregious facts in *LeMaire* make it an attractive case to quote for those opposing confirmation of a Chapter 13 plan

In *Molitor v. Eidson (In re Molitor)*, 76 F.3d 218, 220–21 (8th Cir.1996), the Court of Appeals confirmed that the totality of the circumstances analysis adopted by *Estus* remains in place and should be applied when determining whether to dismiss a Chapter 13 case on grounds of a lack of good faith in the filing of the case. Therefore, the Court will apply the totality of the circumstances test to both the Movants' Motion to Dismiss and the Movants' Objection to Confirmation in this case.

■ Keeping the foregoing principles in mind, we turn to the case at hand. By far the largest amount of the Movants' energy was expended at trial in attempting to demonstrate how reprehensible and criminal Lancaster's pre-filing behavior was and in convincing the Court that the debts owed to the Movants would be nondischargeable in a Chapter 7 proceeding, pursuant to 11 U.S.C. § 523(a)(6). And let there be no doubt that the Court considers Lancaster's actions to be repugnant and reprehensible, as well as criminal. They are clearly relevant to the Court's decision as to whether the Debtor has acted in good faith in these bankruptcy proceedings. *LeMaire*, 898 F.2d at 1352. Lancaster made threats that he would kill Weathers and burn his house down because Weathers was seeing Lancaster's estranged wife. The threats apparently were made after Lancaster overheard a telephone conversation in which Weathers offered advice to

Mrs. Lancaster concerning removing money from the Lancasters' joint banking account before a divorce action was filed. Within days thereafter, Lancaster went to Weathers's house where he said he hoped to confront Weathers and Mrs. Lancaster. Finding no one home, Lancaster apparently flew into a rage and, with apparent calculation, set about to destroy or seriously damage Weathers's home. At trial, Lancaster admitted that he "was out of control" and that he intended to damage Weathers's house. In that, he succeeded.

What is not so clear is whether Lancaster intended to kill Weathers and/or Mrs. Lancaster. Lancaster admitted that he cut the brake line on Weathers's motorcycle, knowing that it was likely that Weathers and Mrs. Lancaster would be riding the motorcycle. Lancaster vehemently denied, however, that he disconnected the propane gas line to the furnace, causing the explosion that destroyed the house and that could well have killed Weathers (or anyone else in the house when it exploded). The jury that heard the civil lawsuit filed by Weathers and his insurance company found that Lancaster had, indeed, disconnected the propane line and awarded Weathers $1,000.00 in damages on that count (for battery). There is little doubt that Lancaster's actions were both willful and malicious within the provisions of § 523(a)(6), and would therefore be nondischargeable in a Chapter 7 proceeding.[9]

---

in cases like the one now before the Court, but those same facts are prone to lead to misapplication of the Court's holdings. Perhaps the Court was aware of these possibilities when it stated: "Our decision should not be read as a broad declaration extending beyond the facts before us. We simply hold that the circumstances surrounding this particular debt reveal that LeMaire did not demonstrate the requisite good faith to seek Chapter 13 protection and that refusing to discharge this particular debt, because of his lack of good faith, is consistent with the policies which the

Bankruptcy Code seeks to advance." *LeMaire*, 898 F.2d at 1353. Therefore, while the pronouncements in *LeMaire* must be followed, they should nevertheless be applied with caution in other cases and other factual situations.

9. Section 523(a)(6) provides:

 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title

However, on the other side of this coin, the Court must also consider the fact that the prosecuting attorney of Barry County charged Lancaster with burglary in the second degree, not attempted murder. That suggests to this Court that the prosecuting attorney did not believe that the State had sufficient evidence to convict Lancaster of attempted murder. Moreover, Lancaster promptly confessed his crimes and pleaded guilty to the State's burglary charge—the guilty plea was entered on December 30, 1998, just over two months after the incident—and was sentenced to a period of probation, which he testified has now been successfully completed. It is also noteworthy (and somewhat curious) that the state criminal court did not order Lancaster to pay restitution to Weathers or the insurance company and did not fine him; such an order unquestioningly would not have been dischargeable in a Chapter 13 case, pursuant to 11 U.S.C. § 1328(a)(3). Finally, the jury in the civil case expressly declined to award Weathers any punitive damages on his claim for trespass (i.e., the property damage to the house) and awarded him only $1,000.00 on his claim for battery, that being the claim that was based on Lancaster's disconnecting of the propane gas line; these verdicts would suggest that a jury of Lancaster's peers did not consider his behavior to be so egregious as the Movants would have this Court believe.

Clearly, Lancaster engaged in an act that was criminal and endangered the lives of others. However, that act occurred nearly four years ago, and Lancaster has been punished under the criminal laws of the state. When consideration is given to all of these circumstances, the Court is not convinced that Lancaster's actions were so egregious, standing alone, as to foreclose him completely from seeking protection and relief under Chapter 13 of the Bankruptcy Code.

■ As additional grounds for dismissal on the basis of bad faith, the Movants point to Lancaster's failure to make any payments to them on the state court judgments and allege that he evaded or delayed their collection efforts for almost 16 months before filing bankruptcy. There is no dispute that Lancaster did not, prior to filing his bankruptcy petition, make any payments to the Movants on their state court judgments. However, the Court does not believe that this fact can be translated into a finding of bad faith in the filing of the Debtor's Chapter 13. In this Court's experience, many debtors do not make payments to their judgment creditors and do not file bankruptcy until the creditors have exerted substantial financial pressure on the debtors, usually by way of a garnishment or a foreclosure proceeding. If a failure to pay prepetition judgment creditors were to be considered bad faith in the filing of a bankruptcy, many cases would be subject to dismissal on that basis. Virtually all bankruptcy cases are filed because the debtors have been unable—and in many cases, unwilling—to pay their creditors. The Court does not consider a debtor's failure (or refusal) to voluntarily pay prepetition creditors to be an indication of bad faith in the filing of a Chapter 13 bankruptcy proceeding and does not believe such behavior warrants dismissal of this case.

does not discharge an individual debtor from any debt—

\*　　\*　　\*　　\*　　\*　　\*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;...

11 U.S.C. § 523(a)(6).

In the same vein, the Movants assert that the Debtor has evaded and frustrated their efforts to collect their judgments, and that this is evidence of the Debtor's bad faith in this bankruptcy filing. The exhibits admitted in evidence reflect that the Movants' attorneys have vigorously pursued collection, and it is equally obvious that they have been frustrated—both legally and practically—in their efforts. The Movants served post-judgment interrogatories on Lancaster and, when he failed to timely respond, they filed a motion to compel his responses.[10] The Movants also conducted a judgment debtor examination. Doubtless, much of the Movants' frustration stems from the fact that Lancaster has no separate assets from which the judgments can be satisfied—he owns all assets in tenancy by the entireties with his wife. Lancaster was not legally obligated or required to use assets that were jointly owned with his wife to pay the Movants' judgments, although that may have been the morally upright thing to do. Additionally, Lancaster did not draw a salary from the family-owned business until January 2002, so garnishments directed at his employer were ineffective; however, the Movants have not shown that Lancaster's failure to draw a salary was a ploy to prevent them from collecting on their judgments.

In his defense, the Debtor points out that his bankruptcy counsel offered the Movants $10,000.00 in full settlement of the judgments, in an effort to avoid a bankruptcy filing, and that that offer was summarily rejected, at least by counsel for Weathers. (Counsel for American Family did not close the door to further negotiations.) After the summary rejection, Lancaster chose not to increase his offer but to file the bankruptcy instead. At trial, Lancaster begrudged that the $10,000.00 offer was "too much" in his opinion; the Court does not find that this comment, standing alone, merits dismissal of the case, but it does bear consideration when making a determination of the Debtor's good faith in proposing a Chapter 13 Plan.

■ As stated previously, the Court does not consider Lancaster's refusal to voluntarily pay something toward satisfaction of the judgments as an indication of his bad faith in these bankruptcy proceedings. It is obvious that Lancaster does not want to pay the Movants, but that does not make him different than many other debtors. As in many cases, there are lingering hard feelings between the creditors and the Debtor, and there is very little for either of them to like about a bankruptcy proceeding. What is more important is what Lancaster proposes to pay and is able to pay the creditors, whether he does it with a smile or with a frown. "Good faith" and "happy" are not and need not be synonymous, at least in the bankruptcy context.

As for the allegation that Lancaster had not commenced making his Chapter 13 Plan payments to the Trustee, it was conceded at trial that Lancaster was current in his payments, thereby removing that argument from consideration.

■ Having focused most of their energies on the egregiousness of Lancaster's October 23, 1998, actions, the Movants totally failed to produce any evidence on the other factors that are to be addressed by the Court, namely (1) whether the Debtor has stated his debts and expenses accu-

10. It was not clear to the Court whether the interrogatories were answered before the Debtor filed his bankruptcy petition in December 2001. It appears that Mr. Rouse, the Debtor's bankruptcy counsel, became involved in these matters at about this juncture and began corresponding with counsel for the Movants. It could well be that the interrogatories were not answered in view of the fact that bankruptcy was being considered.

rately; (2) whether the Debtor has made any fraudulent representations to mislead this Court; and (3) whether the Debtor has unfairly manipulated the Bankruptcy Code. *LeMaire*, 898 F.2d at 1349; *Molitor*, 76 F.3d at 220–221. Despite the lack of evidence on these factors, the Court must nonetheless consider them, because they are central to determining whether the Debtor's petition and plan constitute an abuse of the provisions, purpose or spirit of Chapter 13. *LeMaire*, 898 F.2d at 1351.

First, there is no evidence that Lancaster has failed to state his debts and expenses accurately in his bankruptcy schedules. Lancaster's Schedule I reflects that Lancaster earns $3,000.00 a month gross income at his employment at Signarama, Inc., a company that is owned by his parents, and that his wife earns $1,900.00 a month (gross), also at Signarama, Inc. The Movants have not shown that these income amounts are inaccurate. The Movants made much of the fact that, just a few months before the bankruptcy filing, Lancaster had testified in the judgment debtor examination that he was not receiving any income from Signarama, Inc., but that upon filing the bankruptcy he suddenly had begun earning $3,000.00 a month. Lancaster satisfactorily explained that he had not received any compensation for his work at Signarama, Inc., in the previous two years because the business was just getting started and did not have the cash flow to pay him. He further explained that he and his wife were able to pay their living expenses from funds they had received from the sale of a farm and some cattle a couple of years earlier. The Court would be troubled if Lancaster's income had gone the opposite direction—from $3,000.00 a month to nothing—but that is not the case. The Movants have not adduced any evidence to indicate that the income amounts shown for Lancaster and his wife (who is not a debtor in these proceedings) are incorrect or misleading. Similarly, the Movants adduced no evidence that Lancaster's living expenses were inaccurately stated.

Secondly, there is no evidence that Lancaster has made fraudulent representations to mislead the Court. The Movants have made no such allegations. The Court has reviewed the schedules and the statement of financial affairs filed by the Debtor and does not detect any misleading or fraudulent representations in light of the testimony and evidence that have been presented. There is no indication that the Debtor is hiding or concealing assets.

Thirdly, the Court does not believe that the Debtor has unfairly manipulated the Bankruptcy Code. This is Lancaster's first and only bankruptcy filing to date. He did not file his bankruptcy petition before trial of the civil lawsuit filed against him by the Movants in order to thwart the trial of that case and prevent entry of an adverse judgment against him, as the debtor did in *Slattengren*. Granted, this bankruptcy case was initiated in the face of an impending garnishment, but that is not improper or indicative of bad faith. *See In re Nipper*, 224 B.R. 756, 759 (Bankr.E.D.Mo. 1998). He has not sought the protection of the Bankruptcy Code and used it as a shield while attempting to appeal or upset the state court judgment and to improperly thwart collection of the judgment against him, as the debtors did in *Mattson*. He has not filed repeated Chapter 13 plans to delay these proceedings and the payment of dividends to creditors, as did the debtors in *Mattson*.[11] Wisely, Lancaster

---

11. In *Mattson*, 241 B.R. 629 (Bankr.D.Minn. 1999), the debtors, owners of rental properties catering mostly to low-income tenants, engaged in a series of reprehensible racially discriminatory actions over a lengthy period of time that were intended to force a certain

did not file a Chapter 7 proceeding in an attempt to discharge what would obviously be a nondischargeable debt, and he did not file a motion to voluntarily dismiss his Chapter 13 case when his criminal conduct was brought to the Court's attention, as the debtor did in *Molitor*. In short, there is simply *no evidence to indicate that Lancaster* has manipulated the Bankruptcy Code, either fairly or unfairly. He has taken advantage of the fundamental bankruptcy protections accorded to all debtors by Congress, as expressed in the Bankruptcy Code, and that is not wrong or improper. *In re Mandarino*, —— B.R. ——, ——, 2002 WL 1050388, at *4 (Bankr.E.D.N.Y.2002).

For the foregoing reasons, the Court finds that the Movants have failed to carry their burden of proof to show that Lancaster has filed this Chapter 13 proceeding in bad faith, and the Court will allow the case to continue.

 We turn, then, to the Chapter 13 plan put forward by Lancaster and a determination of whether it has been filed in good faith. In making this determination, it is appropriate to consider the factors set

out by the Court of Appeals in *Estus*, 695 F.2d at 317. The Debtor has the burden of proof to convince the Court that the Plan represents a good faith effort to pay his creditors. The factors are:

1. The amount of the proposed payments and the amount of the Debtor's surplus. In this case, the Debtor proposes to pay $150.00 a month into the Plan for 36 months, or a total of just $5,400.00. According to Lancaster's schedules, this would leave him with a monthly surplus of $35.25, and no explanation has been offered as to why that amount cannot be contributed to the Plan as well. In addition, there are areas in his family budget where savings could be made and additional funds made available to the creditors, as is discussed more fully below.

2. The percentage of payment to unsecured creditors. As just noted, the Debtor proposes to pay just $5,400.00 into the Plan over 36 months. His schedules reflect $184,000.00 in general unsecured debts, all owed to Weathers, Weathers's insurance company, and their attorneys, and all incurred as a result of Lancaster's

tenant to leave the leased premises. Their actions included the use of racial epithets, entering the premises unannounced and at unreasonable times, breaking down the door of the apartment when the tenant and her children was present, peeking in windows, invading the tenant's privacy, and other totally unreasonable and assaultive actions. After the tenant sued and obtained a judgment for $523,191.00, the debtors engaged in "scorched earth" tactics designed to prevent the tenant from collecting her judgment, including transferring properties to relatives, borrowing money from relatives secured by mortgages on the debtors' rental properties, and granting "phantom mortgages" on their properties. The debtors filed numerous motions and appeals in the state courts to impede and delay the collection process. Just before a receiver was to take control of their rental properties, the debtors filed their first Chapter 13 bankruptcy petition, which was

dismissed for failure to file schedules. They promptly filed a second Chapter 13 bankruptcy petition, which was dismissed because the debtors' debts exceeded the allowable amount of unsecured debt for a Chapter 13 case; during this second bankruptcy and in violation of the automatic stay, the debtors sought entry of the final state court monetary judgment so that they could qualify for Chapter 13 relief, but that effort eventually proved unsuccessful. Finally, when the tenant resumed her collection efforts, the debtors filed their third bankruptcy petition and subsequently filed numerous Chapter 13 plans that were objected to by the tenant. Perhaps needless to say, the bankruptcy court found that the debtors had acted in bad faith both in filing their Chapter 13 petition and in proposing their plan and refused to confirm the plan and dismissed the case (with a nine-month bar on refiling).

destructive and malicious actions on October 23, 1998. After deducting the Trustee's fees of approximately 10 percent, Lancaster's Plan would pay the unsecured creditors less than 3 percent of the amounts they are owed. This is clearly inadequate. At the same time, the Court must consider the Debtor's ability to pay. An examination of the Debtor's schedules suggests there are areas where reductions could be made—such as in charitable contributions ($200.00 a month) and support for a daughter at college ($300.00 a month)—so as to make more money available to the creditors. This assumes that the Debtor cannot earn more income than he presently does. The Court would suggest that a Plan that proposes to pay the creditors less than 10 percent of what they are owed is not likely to be found as being filed in good faith.

3. The Debtor's employment history, ability to earn, and likelihood of future increases in income. In this case, Lancaster has a bachelor's degree in education, has taught school, has worked in his family's nursing home businesses (which were sold several years ago), and has farmed, among other things. He is just 42 years old. He has earned larger incomes at previous employment, even while working in the family business. For example, he received an annual salary of $60,000.00 when working as a nursing home administrator, and he (and his wife) received a substantial sum of money from the sale of their stock when the nursing homes were sold. He (and his wife) sold a farm and cattle in 2000 and received a substantial sum, which has been used in paying the family's living expenses. Lancaster rightly points out that the funds received from the sale of these properties were jointly owned with his wife. He is, once again, working in a family-owned business, and one that is just getting off the ground, which limits his income and his income

potential. While the Debtor has shown an ability to earn more than he is earning now, the Court is not convinced that he is manipulating his income so as to keep his Plan payments low. The Movants did not produce any evidence to demonstrate that the family business is presently able to pay Lancaster and his wife more than they are currently earning (even assuming that their services might merit higher pay). Although his wife is not a debtor in these Chapter 13 proceedings, Lancaster has not sought to withhold her income in any way from the performance of the plan, as debtors often do.

4. The probable or expected duration of the plan. As indicated, Lancaster has proposed a plan that runs just 36 months, the minimum permitted by the Bankruptcy Code when creditors are not being paid in full. 11 U.S.C. § 1322(d). While the Debtor cannot be required to file a plan extending beyond 36 months, the Court considers that the proposed 36-month plan, when combined with the rather small monthly payments he has proposed, to not be proposed in good faith.

5. The accuracy of the plan's statements of the debts, expenses, and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court. As previously stated, the Court is not aware of any inaccuracies in the Debtor's listing of debts and expenses and is unaware of any attempts by the Debtor to mislead the Court. So far as the evidence shows, the Debtor has accurately and honestly reported his debts, his income, and his expenses.

6. The extent of preferential treatment between classes of creditors. In this case, the Debtor does not attempt to create any separate creditor classifications and thus there is no preferential treatment of any creditor.

7. The extent to which secured claims are modified. Here, the Debtor has no secured claims.

8. The type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7. As the Court has already discussed at some length, the debts to the unsecured creditors in this case would almost certainly be nondischargeable pursuant to § 523(a)(6). The Debtor's pre-filing conduct, while relevant, is not wholly determinative of the good faith issue. As the *LeMaire* Court recognized, "a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where *other factors* suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims." *LeMaire*, 898 F.2d at 1352, quoting *Neufeld v. Freeman*, 794 F.2d 149, 153 (4th Cir.1986) (emphasis added by the *LeMaire* Court). This factor is certainly a most important factor, as the Court's earlier discussion indicates, but the Court's decision does not turn on this factor alone; because the Debtor has failed to satisfy the Court in other respects that his plan has been proposed in good faith, as well, the Court will not confirm the present plan.

9. The existence of special circumstances, such as inordinate medical expenses. There has been no showing of special circumstances in this case.

10. The frequency with which the debtor has sought relief under the Bankruptcy Code. As noted previously, this is the first bankruptcy filing by the Debtor. He has not abused the bankruptcy process or manipulated the Bankruptcy Code.

11. The motivation and sincerity of the debtor in seeking Chapter 13 relief. The Court believes that the Debtor in this case is generally sincere in seeking Chapter 13 relief and intends to pay his creditors what he must pay them under the provisions of the Bankruptcy Code. Granted, there is little doubt that a significant motivating factor in the Chapter 13 filing was a desire to pay the creditors as little as possible while putting a stop to the Movants' collection efforts. But many Chapter 13 debtors—probably a vast majority—are similarly motivated. Many Chapter 13 debtors file their bankruptcy cases when confronted with wage garnishments or home foreclosures, and many debtors propose zero percent repayment plans. Here, the Debtor has proposed a plan that would pay the creditors approximately 3 percent on their claims, which the Court has found inadequate. A more equitable plan would help to remove any doubts about the Debtor's motivation and sincerity in seeking the protection of the Bankruptcy Code.

12. The burden which the plan's administration would place on the Chapter 13 trustee. There has been no showing in this case that this plan would place any inordinate or unusual burden on the trustee, and the trustee has not objected to the plan proposed by the Debtor.

In summary, the Court will not confirm the Chapter 13 Plan proposed by Lancaster because the Court finds that the present Plan was not filed in good faith. Whenever a debtor seeks a Chapter 13 "superdischarge" of a debt that would be nondischargeable in Chapter 7, and whenever that debtor has engaged in prefiling conduct that is criminal and/or repugnant to societal standards, the Court will subject any proposed plan to a closer degree of scrutiny than might otherwise be the case. This is particularly true where the victim of the proscribed conduct and the parties injured as a direct result of that conduct have raised valid questions about the debtor's good faith in seeking Chapter 13 relief. In this case, the Court finds that the Debtor has not proposed his Plan in

good faith because he has not proposed to pay the victim of his criminal conduct and the parties injured by his conduct a substantial enough amount through the Plan, and he has not devoted a sufficient amount of his income to the payment of his creditors. In preparing an amended plan—if he chooses to file an amended plan—the Debtor and his attorney are encouraged to consider a plan that would devote more of the Debtor's income to the payment of his creditors and that would pay the creditors a greater percentage of their claims, even if that requires a plan of more than 36 months' duration. If the Debtor fails or refuses to file a more equitable plan, these proceedings will be dismissed.

Therefore, it is

**ORDERED** that the Movants' Motion to Dismiss the Debtor's Chapter 13 cases be and is hereby DENIED. It is

**FURTHER ORDERED** that the Movants' Motion to Deny Confirmation of Chapter 13 Plan be and is hereby GRANTED, and the Debtor is hereby granted 20 days from the date of entry of this Order to file an amended plan. If an amended plan is not filed within that period, these proceedings will be dismissed without further notice or hearing.